In re ASSOCIATED GAS & ELECTRIC CO.
No. 21209.

District Court, N. D. New York.
June 17, 1935.

George J. Hatt, II, of Albany, N. Y.,
Martin C. Ansorge, of New York City,
Jacob A. Freedman, of Brooklyn, N. Y.,

J. Joyce Klinger, of St. George, S. I., N. Y., and McCloy & Bravman, of New York City for petitioning creditors (Edwin L. Garvin, I. Maurice Wormser, and Jack Lewis Kraus, II, all of New York City, of counsel), for petitioning creditors.

Travis, Brownback & Paxson, of New York City, and Lee M. Friedman, of Boston, Mass. (Charles M. Travis, George M. LePine, Moses & Singer, Henry B. Singer, Sam L. Cohen, and Alfred W. Bressler, all of New York City, of counsel), for Associated Gas & Electric Co.

Miller, Boston & Owen, of New York City (Nathan L. Miller, Carl M. Owen, and Charles M. Walton, Jr., all of New York City, of counsel), for so-called "Dutch Security Holders."

Piper, Carey & Hall, of Baltimore, Md. (James Piper, of Baltimore, Md., of counsel), for General Inv. Corporation, Albert E. Peirce, B. B. Robinson, and Peirce Inv. Corporation.

MACK, Circuit Judge.

A creditors' petition under section 77B of the Bankruptcy Act (11 USCA § 207) against the Associated Gas & Electric Company, hereinafter referred to as Associated, has been held by me to have been filed in good faith. Pending hearings on the issues of the Associated's insolvency as defined by the Bankruptcy Act and the commission of an act of bankruptcy; the determination of which against the Associated is a prerequisite to the court's approval of the petition, petitioners seek an order enjoining the Associated, its subsidiaries, and controlled affiliates, and their officers, directors, attorneys, and employees from transferring any part of the assets of the Associated system other than in the regular course of business, save after due and reasonable notice to the court and to petitioners, such notice to contain complete information as to the reasons for making the proposed transfer and the proposed disposition of the proceeds to arise therefrom.

Counsel for the Associated contend that section 77B, properly construed, gives the court no jurisdiction over a debtor's property prior to the date of the approval of the petition and that therefore no such injunction may issue at this time; further, that even if there be jurisdiction, the injunction should be denied on the merits.

It is urged against the jurisdiction of the court, that the Bankruptcy Act defines the extent thereof and that while section 2, subdivisions (3) [1] and (15) [2], 11 USCA § 11 (3, 15), expressly gives power to grant injunctions in the ordinary bankruptcy proceedings, section 77B, regulating corporate reorganizations, has no such provision, either expressly or under a proper construction of its subdivision (k) [3], 11 USCA § 207 (k). Associated contends that subdivision (k) must be construed to refer to procedural and administrative, but not to jurisdictional provisions of the act because of section 77A (11 USCA § 206), which provides that "in addition to the jurisdiction exercised in voluntary and involuntary proceedings to adjudge persons bankrupt, courts of bankruptcy shall exercise original jurisdiction in proceedings for the relief of debtors, as provided in Section 77B of this Act [section 207 of this chapter]." The argument for this construction is that section 77A established an entirely distinct bankruptcy jurisdiction, defined and limited by the provisions of section 77B.

But, Associated urges, even if subdivision (k) is not to be so construed, the power conferred by section 2, to issue injunctions immediately on the filing of an involuntary petition in bankruptcy, is inconsistent with the spirit and intent of section 77B and must therefore be deemed as not within subdivision (k). The inconsistency is sought to be shown by analysis both of the general purpose and of various specific provisions of the section. The purpose of section 77B, it is said, is to facilitate corporate reorganizations "for the relief of debtors," in the accomplishment of which the entry of an order approving the peti-

---

[1] The court shall have power to "(3) appoint receivers or the marshals, upon application of parties in interest, in case the courts shall find it absolutely necessary, for the preservation of estates, to take charge of the property of bankrupts after the filing of the petition and until it is dismissed or the trustee is qualified."

[2] The court shall have power to "(15) make such orders, issue such process, and enter such judgments in addition to those specifically provided for as may be necessary for the enforcement of the provisions of this Act [title]."

[3] "All other provisions of the Act [this title], except such as are inconsistent with the provisions of this section [77B] shall apply to proceedings instituted under this section. * * *"

tion is the first real step; this, in contradistinction to the ordinary involuntary bankruptcy proceeding aiming at liquidation, in which adjudication is in a sense the final step except for the actual liquidation. Because of this difference in the nature of the proceedings, approval of the petition by the court, it is contended, is a prerequisite to the acquisition of jurisdiction over debtor's property.

This general conclusion of inconsistency is sought to be buttressed by the language of several specific provisions of section 77B. Subdivision (a), 11 USCA § 207 (a),[4] it is urged, makes approval an express condition precedent to such jurisdiction. This in turn, it is said, is supported by subdivision (o), 11 USCA § 207 (o),[5] which, by negative implication, it is urged, must be construed as a denial of jurisdiction over a debtor's property prior to approval. In contrast, Associated points to similar provisions of section 74 (m), as amended (11 USCA § 202 (m),[6] dealing with compositions, and of section 77 (n),[7] 11 USCA § 205 (n), dealing with

railroad reorganizations, both emphasizing the date of filing the petition.

Although subdivisions (a) and (o) of section 77B are the Associated's chief reliance, various other provisions thereof are likewise pointed out as tending to show inconsistency between this section and section 2. It is urged as to subdivision (c) (1), 11 USCA § 207 (c) (1),[8] that the court is without power to appoint a trustee of the debtor's property before approval of the petition and that therefore the date of approval must be considered the crucial date with respect to the court's acquisition of jurisdiction over the debtor's property. Subdivision (m), 11 USCA § 207 (m) that "no judge, debtor, or trustee acting under this section" shall enter into a so-called "yellow dog contract," is contrasted with an analogous provision in section 77 (q), 11 USCA § 205 (q), that "no judge, trustee, or *receiver* acting under this Act [title] shall," etc. From the absence of any mention of a receiver in subdivision (m), the inference is drawn that no receiver may at any time be ap-

[4] "* * * If the petition or answer is so approved, an order of adjudication in bankruptcy shall not be entered and the court in which such order approving the petition or answer is entered shall, during the pendency of the proceedings under this section, have exclusive jurisdiction of the debtor and its property wherever located for the purposes of this section, and shall have and may exercise all the powers, not inconsistent with this section, which a Federal court would have had it appointed a receiver in equity of the property of the debtor by reason of its inability to pay its debts as they mature."

[5] "(o) In proceedings under this section and consistent with the provisions thereof, the jurisdiction and powers of the court, the duties of the debtor and the rights and liabilities of creditors, and of all persons with respect to the debtor and its property, shall be the same as if a voluntary petition for adjudication had been filed and a decree of adjudication had been entered on the day when the debtor's petition or answer was *approved.*" (Italics mine.)

[6] "(m) The *filing* of a debtor's petition or answer seeking relief under this section shall subject the debtor and his property, wherever located, to the exclusive jurisdiction of the court in which the order approving the petition or answer as provided in subdivision (a) is filed. * * * In proceedings under this section, except as otherwise provided therein,

the jurisdiction and powers of the court, the title, powers, and duties of its officers and, subject to the approval of the court, their fees, the duties of the debtor, and the rights and liabilities of creditors, and of all persons with respect to the property of the debtor and the jurisdiction of appellate courts shall be the same as if a voluntary petition for adjudication had been filed and a decree of adjudication had been entered on the day when the debtor's petition or answer was *filed* and any decree of adjudication thereafter entered shall have the same effect as if it had been entered on that day." (Italics mine.)

[7] "(n) In proceedings under this section and consistent with the provisions thereof, the jurisdiction and powers of the court, the duties of the debtor and the rights and liabilities of creditors, and of all persons with respect to the debtor and his property, shall be the same as if a voluntary petition for adjudication had been filed and a decree of adjudication had been entered on the day when the debtor's petition was *filed.*" (Italics mine.)

[8] "Upon approving the petition or answer or at any time thereafter, the judge * * * (1) may, after hearing upon notice to the debtor and to such others as the judge may determine temporarily continue the debtor in possession" of its property.

pointed for the debtor's property; this, in turn, is said to show that the court has no jurisdiction over such property prior to the date of approval. Similarly, subdivision (c) (10), 11 USCA § 207 (c) (10),[9] is asserted to mean that no injunction against the commencement or prosecution of suits against the debtor may issue until after approval, in contrast to the ordinary bankruptcy case in which, by the express provision of section 11, such injunction may issue before a decree of adjudication is entered. Thus again, it is urged, is shown the intent of Congress to make approval the earliest date for the court's exercise of power over a debtor's property.

Finally, subdivision (i), 11 USCA § 207 (i), is relied upon. This provides that if a receiver has theretofore been appointed for the property of a corporation, a petition or answer may be filed under section 77B, at any time thereafter, by the corporation or creditors, "and if such petition or answer is approved, the trustee or trustees appointed under this section * * * shall be entitled forthwith to possession of and vested with title to such property. * * *" This, it is urged, establishes, first, that no receiver of a debtor's property may be appointed under section 77B, and that after the petition is approved, the property must either be turned over to a trustee, if one be appointed, or continue with the debtor; and, second, that prior to approval of the petition, any receiver or trustee of the debtor's property, appointed in any other proceeding, is to remain in possession of the property, thus indicating again that, under section 77B, the court acquires no jurisdiction over such property until approval.

The language of the statute, however, is at least equally susceptible of a contrary construction. In these circumstances, considerations both of policy and of legislative background must be invoked to resolve any ambiguity; these, in my judgment, are conclusive against the Associated's contentions.

I shall assume, purely arguendo, that the court is not authorized to grant the injunction by virtue of any general equity power (but cf. Continental Illinois Bank & Trust Co. v. Chicago, R. I. & P. Ry. Co., 55 S. Ct. 595, 79 L. Ed. 1110, April 1, 1935) or of any express power conferred by section 77B; further, that any such power must be derived from section 2, subds. (3) and (15), 11 USCA § 11 (3, 15), incorporated into section 77B by subdivision (k) thereof, 11 USCA § 207 (k).

The argument that subdivision (k) refers to administrative and procedural rather than jurisdictional provisions is based upon the fallacious assumption that section 77B, in relation to the other provisions of the Bankruptcy Act, is separate and distinct rather than an integral part of one complete act. The provision for liquidation (subdivision [c] [8], 11 USCA § 207 (c) (8), should an attempted reorganization fail, is a strong indication that section 77B is designed as an additional remedy within the ordinary bankruptcy jurisdiction rather than as an entirely new proceeding. Subdivision (c) (10), 11 USCA § 207 (c) (10), tends to the same conclusion. The language there used, "in addition to the provisions of Section 11 of this Act [section 29 of this title] for the staying of pending suits against the debtor," implies that all the provisions for injunctions are to be read together as part of one entire act. The House Report on the bill is also of some significance (H. R. 194, 73d Cong. 1st Sess. 1934). "It is the purpose of this bill to bring the exercise of the bankruptcy powers more in line, from a practical and helpful standpoint, with the necessities of both distressed debtor corporations and their creditors, and to reduce the expense and delay of administration." The indication here, too, is that section 77B is but an added step in bankruptcy rather than an organically new legal proceeding. The language of section 77A does not compel the conclusion asserted by Associated and in the light of these other considerations,

---

[9] "Upon approving the petition or answer or at any time thereafter, the judge, * * * (10) in addition to the provisions of section 11 of this Act [section 29 of this title] for the staying of pending suits against the debtor, may enjoin or stay the commencement or continuation of suits against the debtor until after final decree; and may, upon notice and for cause shown, enjoin or stay the commencement or continuation of any judicial proceeding to enforce any lien upon the estate until after final decree."

that conclusion must be rejected. Cf. Continental Illinois National Bank & Trust Co. v. The Chicago, Rock Island & Pacific Ry. Co., supra.

■■ The question is whether or not subdivisions (3) and (15) of section 2 in so far as they provide for the issuance of injunctions before adjudication are inconsistent with the provisions of section 77B. I cannot concur in the contention that the difference in the nature of ordinary bankruptcy proceedings and of reorganization proceedings under section 77B demonstrates such an inconsistency. An injunction in ordinary bankruptcy cases issued immediately on the filing of the petition aims to prevent dissipation of the assets of the alleged insolvent, in anticipation of a possible or probable adjudication. In re Mitchell, 278 F. 707 (C. C. A. 2d, 1922). It is, of course, none the less valid even though eventually the adjudication fails and the petition in bankruptcy is dismissed. Creditors of a corporation against which an involuntary petition under section 77B is filed may be in no less need of such protection against dissipation of assets. Whether the section 77B proceedings will end in reorganization or, as in ordinary bankruptcy, in liquidation, the creditors have a present direct interest in the maintenance of the debtor's property. That the section is labeled "for the relief of debtors" is immaterial. This tag was attached to what was apparently the earliest draft bill (that of March 1, 1932), embodying in rough form the recent amendments to the Bankruptcy Act; in it, no provision was made, either in the railroad or corporate reorganization sections, for creditors' petitions. But under section 77B as finally enacted, the scope of the proceeding was broadened by the provision for involuntary petitions; the interests of creditors as well as of the debtor are therefore to be considered in construing the language of the act. The term "approval" may well have been substituted for "adjudication" merely to remove the odium commonly attached to the latter term in ordinary bankruptcy cases; no inference can fairly be drawn from this difference in language, especially as in several provisions of section 77B, an order of approval is expressly assimilated to an order of adjudication.

Associated urges that subdivision (a) of section 77B, 11 USCA § 207 (a), not only confers jurisdiction, but fixes as well the time of its acquisition and that, as of the date of approval; therefore, it is said to be inconsistent with the provisions of section 2 (11 USCA § 11), under which jurisdiction is expressly exercisable prior to adjudication. But the provision that "an order of adjudication in bankruptcy shall not be entered" may well have been deemed to require the language immediately following it in order to make clear that, even though there is to be no "adjudication," the jurisdiction of the court is at the least no weaker than in a proceeding in which adjudication is had; therefore this provision indicates no limitation on the court's power. Furthermore, the purpose of the provision clearly is to emphasize that the court's jurisdiction extends to the debtor's property "wherever located" despite the fact that no adjudication is entered; it is in this respect unlike the restricted territorial jurisdiction either in equity or prior to adjudication, in the ordinary bankruptcy proceeding. For this reason, no negative implication limiting the court's power prior to approval is to be inferred.

■■ In this case and at this time, I need decide as to section 77B, subd. (a), 11 USCA § 207 (a), only that it does not fix the time of acquisition of jurisdiction. The same provision, in precisely the same words, is found in section 77, subd. (a), 11 USCA § 205 (a); but subdivision (n) of that section (11 USCA § 205 (n) expressly provides that jurisdiction is acquired on the filing of the petition. Subdivision (a) of section 77 does not, therefore, afford any negative implication that the court has no jurisdiction in respect to the debtor's property prior to approval. Section 77B, subd. (a), likewise must be held to give rise to no such negative implication, since identical provisions in identical positions in two similar sections of the same act should normally be similarly interpreted.

■ Subdivision (o) of section 77B (11 USCA § 207 (o), especially when contrasted with the corresponding provisions of sections 74, as amended, and 77 (11 USCA §§ 202, 205), apparently gives more support to Associated's contentions. But it is to be noted that the second sentence of section 74 (m), 11 USCA § 202 (m), is almost identical with the whole of sections 77 (n) and 77B (o), 11 USCA §§ 205 (n), 207 (o). The first sentence of section 74 (m), 11 USCA § 202 (m), is

an express grant of jurisdiction over the debtor and his property on the date of filing the petition; no similar provision is found in section 77 or 77B. The second sentence is therefore apparently intended primarily for some purpose other than a grant of jurisdiction; presumably the similar provisions in 77 (n) and 77B (o) are likewise primarily intended for such other purpose. That purpose, so far as section 77B is concerned, may be found in the assimilation of the date of approval with the date of adjudication. Subdivision (o) means only what it affirmatively states, that the jurisdiction and powers of the court, the duties of the debtor, and the rights and liabilities of creditors and of other persons with respect to the debtor and its property are the same upon approval of a 77B petition as they are upon an adjudication in ordinary bankruptcy proceedings. For example, after approval as after adjudication title to the debtor's property may be conferred upon a trustee; likewise, the protection afforded bona fide purchasers of the debtor's property ceases on the date of approval as it does on the date of adjudication. Why sections 74 and 77 assimilate the filing of the petition with adjudication in ordinary bankruptcy proceedings is not clear;[10] it would seem, however, that the assimilation of the court's jurisdiction after approval under section 77B to its jurisdiction after adjudication is not intended to create an implication that the court does not have the same jurisdiction prior to approval that it has prior to adjudication or that it is without any jurisdiction before approval. Clearly, jurisdiction over the subject-matter attaches when the petition is filed and over the person when

properly brought in. As heretofore stated, creditors may have the same need of protection against dissipation of assets immediately after filing the petition, whether the proceedings are designed to effect liquidation in bankruptcy or reorganization under section 77B; only a clearly expressed denial of the right to grant them that protection before approval should lead the court to the construction of section 77B contended for by Associated.

Subdivision (c) (10) of section 77B, 11 USCA § 207 (c) (10), seems to militate against rather than to support the Associated's contention of inconsistency. The provision is: "Upon approving the petition or answer or at any time thereafter, the judge * * * (10) in addition to the provisions of Section 11 of this Act [section 29 of this title] for the staying of pending suits against the debtor, may enjoin or stay the commencement or continuation of suits against the debtor until after final decree. * * *" Section 11 (11 USCA § 29) provides for injunctions only against certain suits *pending* at the time the petition in bankruptcy was filed; section 77B, subd. (c) (10), however, expressly grants power "upon approving the petition" to enjoin threatened suits as well. Moreover, under the broad language of the provisions, suits may be enjoined whether begun before or after the filing of the petition and whether or not relating to a debt dischargeable in bankruptcy. Interpretation of (c) (10) to provide expressly for additional power to enjoin, at least after approval, and not as a limitation on the power granted under section 11 (11 USCA § 29) or under section 2 (15), 11 USCA § 11 (15), so as to cut off the court's power between

10 A reason for the assimilation of the date of the filing of a petition under section 74 with the date of adjudication may be that in this section only voluntary petitions are provided for, so that an ex parte hearing as to whether the petition fulfills the formal requirements and is brought in good faith is all that intervenes between the filing and approval of the petition. The deferring of argument on all disputed issues until after approval means, as a practical matter, that the filing and approval will be practically simultaneous. This reasoning is supported by the language of section 74 (m): "The *filing* of a debtor's petition * * * shall subject the debtor and his property, wherever located, to the exclusive juris-

diction of the court in which the order *approving* the petition * * * is filed. * * *" (Italics mine.)

This reasoning is, of course, not applicable to section 77, under which involuntary petitions are permitted. But such involuntary petitions may be filed only on notice to the Railroad Corporation and, after hearing, on approval by the Interstate Commerce Commission. It may well have been thought that if the commission approved the petition on the merits, the court's approval would almost invariably follow, and that therefore the jurisdiction of the court on the filing of the petition might be assimilated to its jurisdiction on entry of an order of adjudication.

the filing of the petition and its approval, coincides with the need of giving creditors in section 77B proceedings the same protection as in ordinary bankruptcy proceedings. It is also supported by consideration of the possible consequences attendant upon lack of power to enjoin before approval in the case of voluntary petitions. If the court, prior to approval, were powerless to stay suits, judgments might conceivably be entered against and collected from the debtor before approval; this might defeat all chances of a successful reorganization. Certainly Congress cannot be presumed to have intended any such result.

These views are supported by a consideration of the legislative background. In the bill introduced by Mr. Summers on January 23, 1933, one of the forerunners of the final enactment, a provision nearly identical with subdivision (c) (10) was included, but it was placed in such a position in the bill as not to follow "upon approval of the petition"; similar, too, is section 77, subd. (l), 11 USCA § 205 (l); cf. section 74 (n), 11 USCA § 202 (n). No limitation on the power of the court can therefore properly be based on the position of the provision in the section.

■ The other provisions relied upon by the Associated (subdivisions [c], [l], [m], and [i]), 11 USCA § 207 (c, l, m, i), may, for the present purposes, be considered together. The implication is sought to be drawn from each of them that no receiver may be appointed for the debtor's property prior to approval of the petition. Even if this be so, and I express no opinion thereon, it would not follow that the power to enjoin threatened dissipation or disintegration of the assets is likewise lacking. Even an express provision that the debtor alone is to remain in possession of its property until approval of the petition would not be inconsistent with the power of the court to control the debtor in the use or disposition thereof, if deemed necessary or proper to prevent a dissipation of the assets.

In Re Fox Metropolitan Playhouses, 74 F.(2d) 722 (C. C. A. 2d, 1935), the question for determination was whether or not, in a 77B proceeding, I had abused a discretion or had denied an absolute statutory right, in setting aside an order, entered before approval, for a 21a (11

USCA § 44 (a) examination, as well as in refusing to grant another 21a examination on an application made after approval of the petition. While my reason for setting aside the order entered before approval was the same as that which led me to deny the application for examination, made after approval, namely that the purpose in each instance was not within the scope of a 21a examination, the court in affirming the first order said that the estate of the debtor, before approval, was not "in process of administration" and its property not in custodia legis under section 77B.

■ The Associated urges that the power of the court to grant an injunction in ordinary bankruptcy proceedings is based on the fact that the property affected by the injunction is in custodia legis or in process of administration, and that since the property of the Associated is not at this time, according to the Fox Metropolitan opinion, in that situation, no injunction may issue. In my judgment, the argument fails. The realities of the situation confronting the court, rather than the applicability to that situation of a concept such as in custodia legis or "in process of administration," must determine the existence or nonexistence of injunctive power under the act. In Re Mitchell, 278 F. 707 (C. C. A. 2d, 1922), the court does use these expressions, but it emphasizes the view that an injunction restraining dissipation of property adversely claimed is essential to maintain the bankrupt estate intact so that the adjudication, if it follows, might be effective as to the property in question. Since the property was adversely held under a claim of right, the validity of which was determinable only by a plenary suit, the property was not actually at the time in custodia legis in the fullest sense; nevertheless, the injunction was granted as necessary. So here, the court, which clearly has jurisdiction over the subject-matter of the cause and the person of the debtor, may be called upon to exercise some control over the property of the debtor even before the estate is "in process of administration"; its order, operating in personam against the defendant, aims to protect the potential custody. I cannot therefore interpret the Fox Metropolitan Playhouses, Inc., opinion as intended to cover the present situation. Cf.

Gerdes, Jurisdiction in Proceedings under section 77B (1935), 4 Brooklyn L. R. 237, 246.

On the factual issues raised by petitioners' application, the evidence has been presented in voluminous affidavits, for the most part irrelevant and, in their relevant portions, far from satisfactory on many of the disputed issues.

The novelty of the order requested has not alleviated the difficulty. As heretofore stated, petitioners seek not an absolute injunction against transfers out of the regular course of business, but only an injunction against such transfers without reasonable notice thereof to the court and to petitioners' attorneys, so that the latter may, upon receipt of such notice, invoke the full injunctive power of the court if they deem it necessary.

 While the order sought would secure to petitioners the protection which they believe necessary, it would place on the company the lightest possible burden consistent therewith. Its purpose is only to secure information as to the proposed course of business contemplated by the company so as to enable petitioners to determine whether, if effectuated, it would entitle petitioners to ordinary injunctive relief; clearly, therefore, the same showing of threatened, irreparable injury that would be required for such ordinary injunction would not seem to be essential to the relief presently requested. On the other hand, the lessening of the burden on the company is, of course, not in itself sufficient ground for granting any injunction. In my judgment, what petitioners must show is such mismanagement and maladministration of the company's business in the past as to create a reasonable fear that there may be a dissipation of assets in the future if no injunctive relief be afforded.

 The question of the actual or probable insolvency of the company, to which the affidavits were chiefly addressed, is material only to show that petitioners, if they eventually prove insolvency, will succeed in these proceedings and that therefore maintenance of the status quo is necessary for the protection of creditors. Without expressing any opinion on the ultimate question of insolvency, to be determined only after a full hearing on all of the relevant facts that may be then presented, I find that for present purposes, petitioners have made a prima facie case; on consideration of the affidavits presented, I cannot hold that there is only a negligible chance of their ultimate victory. Associated's contention that an injunction may issue only if petitioners establish a strong probability that they will be able to prove insolvency and thereby secure approval of the petition, is, in my judgment, unsound. The decisions cited to support this proposition (Hall Signal Co. v. General Ry. Signal Co., 153 F. 907 [C. C. A. 2d, 1907]; Star Co. v. Colver Pub. House, 141 F. 129 [C. C. S. D. N. Y. 1905]; Brooklyn Baseball Club v. McGuire, 116 F. 782 [C. C. E. D. Pa. 1902]; Mitchell et al. v. Colorado Fuel & Iron Co. et al., 117 F. 723 [C. C. D. Colo. 1902]) merely hold that, in an action for an injunction or other equitable relief, a preliminary injunction will not be granted unless the plaintiff shows a probability of his ultimate success. In such cases, the right to a preliminary injunction is generally based upon the same grounds as those for permanent relief; in such a situation, relief may well be denied unless a strong probability of ultimate success is created. Petitioners, however, presently seek only such a limited injunction as will enable them, if it becomes necessary, to ask the court from time to time to maintain the status quo pending the determination of the proceedings; in other words, so that temporary injunctions against specific transactions, if granted after a hearing, may not have been rendered ineffective.

 No case has been cited or found in which a bankruptcy court has required a showing of probable insolvency even as a prerequisite to the issuance, prior to the date of adjudication, of an injunction forbidding transfers, nor has any logical reason been advanced for such a showing under section 77B. It is to be noted that section 11 (a) of the Bankruptcy Act (11 USCA § 29 (a), which provides that "a suit which is founded upon a claim from which a discharge would be a release, and which is pending against a person at the time of the filing of a petition against him, shall be stayed until after an adjudication or the dismissal of the petition," contains no requirement that the petitioners in an involuntary petition shall show probability of success in having the debtor adjudicated a bankrupt. Jurisdiction of the court having been here

invoked for the protection of creditors, the court should not, in the exercise of a sound discretion, allow those creditors to be injured by a possible dissipation of assets, if a likelihood thereof is shown and solvency of the debtor is open to reasonable doubt.

Petitioners rely chiefly on various transfers of property by the Associated and its subsidiaries in connection with debtor's "Plan of Rearrangement of Debt Capitalization"—the so-called Recap plan —to show a danger of future dissipation of assets. This plan, announced in May, 1933, provides that holders of Associated's debentures may exchange their bonds for securities of the Associated Gas & Electric *Corporation*, a wholly owned subsidiary of the Associated Gas & Electric *Company*, or for a different type debenture of the *company*, on one of the following bases: (1) Fixed interest debentures of the *corporation* of a principal amount equal to 50 per cent. of the principal amount of the debentures turned in for exchange, with the interest rate unchanged; (2) income debentures of the *corporation*, of the same principal amount as the debentures turned in, but with the interest rate reduced and payable only out of net income after fixed charges; (3) sinking fund income debentures of the *company*, issued on terms which are not, for present purposes, material.

The Associated Gas & Electric *Corporation* is the principal point of attack. While the history of that enterprise is shrouded in some mystery, several matters are undisputed. It was originally incorporated in Delaware in 1922, as the Associated Utilities Investment Corporation, with a capitalization of $100,000, representing a total of 1,000 no par value shares issued at $1 per share to Associated Gas & Electric *Company,* but subsequently by a charge of $99,000 against surplus reaching the stated value of $100 per share. Substantial advances were made by the *company* to this subsidiary in subsequent years, amounting, by the end of 1929, to approximately $350,000,000. On December 31, 1927, à contract was entered into between the *company* and the *corporation* whereby all past loans were transmuted on the books of the *company* and of the *corporation* into stock subscriptions on the basis of $100 per share and it was agreed that all future loans were to be treated in the same manner. In 1932, the name of the Associated Util-

ities Investing Corporation was changed to the Associated Gas & Electric *Corporation.*

The inference is sought to be drawn that the corporation was merely a dummy, utilized unfairly to force through the Recap plan. Because of the transfer to the *corporation* of most, if not all, of the *company's* assets in return for the *corporation's* stock, those who exchange their *company* bonds for *corporation* debentures under either option 1 or 2, acquire securities which have priority over the *corporation* stock, practically the sole source of eventual payment to *company* bondholders who refuse to exchange. Assuming all exchanges to be made under option 1, if the *corporation* and *company,* taken together, have assets of a value of more than 50 per cent. of the amount of their outstanding indebtedness, and/or have income equivalent to more than 50 per cent. of the fixed interest charges against the company prior to the plan, those who make the exchange are in a worse position than those who have held on. On the other hand, again assuming all exchanges to be made under option 1, if the *corporation* and *company,* considered together, have assets of a value less than 50 per cent. of the amount of their outstanding indebtedness and/or if their income is less than 50 per cent. of the fixed interest charges against the *company* prior to the plan, those who retain their original debentures are directly ·injured by all exchanges made. A lesser degree of insolvency and a smaller deficiency in income would in all probability have the same injurious effect upon the *company's* debenture holders if many of the exchanges are made under option 2. Petitioners assert that the transfer of assets by the *company* to the *corporation* was made in anticipation of the Recap plan, in order that bondholders, faced with this dilemma, might resolve it in favor of the safer investment, despite possible pecuniary sacrifice. For this reason, they assert that the transfer was a fraud and shows the dishonesty of the management.

Some question is raised as to the standing of petitioners, who have not exchanged their debentures, to attack the fairness of the plan. It is urged that, if the transfer of assets by the *company* to the *corporation* was a fraud, the fraud was in creating˙ unfair pres-

sure upon *company* bondholders to exchange their debentures for *corporation* bonds at a pecuniary loss, and that, therefore, petitioners are uninjured since the value of their investment increases to the extent of that loss. See Berwick v. Associated Gas & Electric Co. et al. (Del. Ch.) 174 A. 122. The argument fails of conviction. Although the corporation bonds are of a principal amount of only 50 per cent. of the principal amount of those exchanged, they are, of course, a safer investment, and if the company and corporation, taken together, have assets of a value of less than 50 per cent. of the amount of their outstanding indebtedness and/or their earnings are less than 50 per cent. of the fixed charges of the company prior to the plan, they are, because safer, a more financially advantageous investment. If this situation exists, the gain of those who have exchanged is the loss of those who have not, including petitioners. That a large percentage of bondholders have made the exchange would seem to indicate that the existence of this situation is well within the realm of possibility. Associated's vice president asserts that the possibility of reconversion, which is allowed under option 1 at the expiration of three years, is "a highly remote contingency." Thus, if the assertion is true that the transfer to the *corporation* in conjunction with the plan is a fraud upon the *company's* bondholders, the possible injury both to those who have exchanged and to those who have retained their debentures would, in my judgment, give each class a standing to object thereto. Regardless of what decision they make with respect to the plan, all bondholders have a right to object to being forced to make such a hazardous choice, if the forcing of that choice results from the fraud of the management.

The existence of such fraud depends upon whether the transfers to the *corporation* and the transmutation of these loans into stock subscriptions were made for a legitimate purpose. Associated relies upon the facts that the *corporation* was originally formed in 1922, that loans totalling approximately $350,000,000 were made to it prior to December 31, 1929, and that the agreement to change accounts receivable to stock subscriptions was entered into at the end of 1927, to prove that the transfers to the *corporation* could not have been made with a view to the Recap plan,

which was not promulgated until May, 1933. Although this contention is not without considerable weight, several other factors militate against it. There can be no doubt that the *corporation* is little more than a bookkeeping unit of the *company*. It has no real organization, its officers and directors are the officers and directors of the *company*, and its accounts are kept in the offices of the *company* in Ithaca. Neither in this proceeding nor in the hearings before the Federal Trade Commission was any satisfactory explanation given by Associated for the formation of the *corporation* or the transfer of assets to it other than that it was organized for "acquiring securities of companies which ultimately would be desirable in connection with the present holdings of this company (Associated Gas & Electric Company)." Nor is any light thrown thereon by the agreement made on December 31, 1927, between the *company* and the *corporation,* for the transmutation of all past and future advances into stock subscriptions and the ratification thereof in 1928 by the board of directors of both concerns and by the stockholders of the *company*. That agreement contains no statement of the amount of assets transferred to the *corporation* prior to that time or of the contemplated amount to be transferred in the future. The contract merely recites that the *corporation* "has in the past required and will from time to time hereafter require funds for its corporate purposes." Prior to 1932, no statement appears to have been given to security holders of the *company* of the substantial nature of the advances made to the *corporation* or of the reasons therefor. Moreover, although approximately $350,000,000 was advanced to the *corporation* prior to the end of 1929, the *company* now has 6,710,000 shares of *corporation* stock, indicating additional advances of about $321,000,000 subsequent to 1929. No explanation of these additional advances has been presented to dispel the inference that they were made in anticipation of the Recap plan. Moreover, there seems to be a serious question as to whether these transfers to the *corporation* were made in violation of a covenant in the Associated debentures' indentures, that no conveyance of "substantially all the properties of the Company as an entirety" shall be effected unless the transferee thereof expressly assumes the

obligation to make due and punctual payment of the principal and interest of all debentures. Apparently there was no such assumption of obligation by the *corporation*.

Even assuming that the transfer of assets was not in anticipation of the Recap plan, the inference of fraud would not thereby necessarily be dissipated. It may be that the motive for the transfer was to utilize the *corporation* as a means of selling additional securities to the public if and after the credit possibilities of the *company* were exhausted. The issuance of the baby bonds of the *corporation* in 1932 lends support to this view. If such was in truth the motive, the transfer cannot be said to have been for a legitimate purpose, since an issuance of securities by the *corporation,* if made while the *company* was known to be in a financially precarious position, might well be found to have been a fraud on the security holders of the *company;* it would have created an obligation prior to the *corporation's* stock, to be met out of the very assets to which the *company* had to look for the means whereby eventually to pay its security holders.

The character of all the dealings of the *company* with the *corporation,* together with the consistent attitude of silence in respect thereto maintained by the *company* and its officials, is reasonable fear that the rights of the *company's* creditors may have been endangered thereby and that such danger will continue unless injunctive relief, of the nature requested by petitioners, be afforded.

Petitioners also attack an agreement entered into on August 28, 1934, between the Chase National Bank of New York as vendor and certain of Associated's subsidiaries as purchasers, for the sale and purchase respectively of (a) promissory notes due on demand after September 15, 1934, of Municipal Service Company, an independent public utility holding company, in the principal amount of $3,899,-635.22, with interest at 5 per cent. per annum; (b) 19,554 shares of no par value stock of the Municipal Service Company; and (c) $4,249,000 principal amount of Associated's Convertible 4½ per cent. Gold Debentures, due 1949. In payment for these securities, Associated's subsidiaries delivered $4,000,000 principal amount of 4½ per cent. Gold Bonds, due 1953, of Associated Electric Company, and $52,000 principal amount of Gold Bonds, due 1962, of Pennsylvania Electric Company. Petitioners assert that the securities given to the Chase were of far greater value than those received in exchange therefor and that the motivation of the transaction was to induce the Chase Bank, which had refused to deposit its debentures under the Recap plan and had made public its position in respect thereto, to refrain from further opposition.

As to whether or not the Chase received excessive consideration for its securities, the evidence is confusing and contradictory. The market value of Associated's debentures surrendered by the bank was approximately $637,350, while the market value of the bonds given to it was approximately $1,474,720, or a difference of $837,370. Since the common stock of the Municipal is apparently worthless, the question is whether the Municipal notes of something less than $4,000,000 were worth at least $837,370.

Frederick W. Burroughs, Associated's vice president, states in his affidavit of November 20, 1934, that "for the year ending July 31, 1934, the consolidated net earnings of Municipal Service Co., after payment of the interest on its funded debt and all other charges prior to interest on the notes purchased, were $204,-060.78 and the annual interest requirements at 5% on the notes purchased by the subsidiaries of the Alleged Debtor were $194,-981.76. While all of the consolidated net earnings are not presently available for the payment of interest on its notes, the advantageous character of the purchase is quite apparent." Whatever the affiant may have meant by the foregoing statement it is, in my judgment, lacking in accuracy and in frankness.[11] As shown

---

[11] At page 3232 of the testimony in this cause Burroughs testified in connection with a certain telegram incident that he "had read most of the testimony myself" on the good faith hearing, and at page 3234 in answer to the court's question as to whether he "had read the testimony from day to day," he answered, "Yes"; in his surrebuttal affidavit of January 10, 1935, page 79 for use on the present issue, he stated that he had "not personally examined the record of the testimony on the issue of good faith." I accept, however, Burroughs' explanation of the affidavit as intending to mean that he had not personally examined the record at this

in the affidavit of Edward L. Love, vice president of the Chase Bank, submitted on Associated's behalf, the $3,899,635.22 5 per cent. notes, given by the Chase to Associated's subsidiaries, were issued to the Chase by the Municipal as of September 1, 1934, in exchange for notes in the principal amount of $3,338,071.66 and accrued interest thereon, at the rate of 7 per cent. Thus, for the year ending July 31, 1934, the interest on the Municipal notes represented in the exchange was not $194,981.76, the impression apparently sought to be conveyed, but $233,665.02, 7 per cent. of $3,338,071.66. The statement that "all of the consolidated net earnings are not presently available for the payment of interest on the notes" is not explained; nowhere does the affiant indicate, although challenged by one of petitioners' affiants to do so, what interest payments were made or to what other purpose the money was allocated. The doubt created by this silence is enhanced by Mr. Love's affidavit, wherein it appears that accrued interest on the notes as of September 1, 1934, was $561,563.56 ($3,889,635.22 principal amount 5 per, cent. notes—$3,338,-071.66 principal amount 7 per cent. notes plus $561,563.56 interest accrued). Moreover, it seems unlikely that the Chase Bank would have sold the notes for about 20 cents on the dollar had so large a proportion of the annual charges actually been earned, with the prospect, as stated by Burroughs, of these earnings continuing or at any rate if the net earnings had been in fact applicable to this interest.

To prove that the notes have substantial value, Burroughs states that he has applied to the Municipal properties several of the valuation methods urged by petitioners for application to Associated's properties and that his computation shows that, by each of these methods, the value of the notes is substantially in excess of $837,370. Since the figures on which he bases his computations nowhere appear, they have but little probative force.

On the other hand, petitioners have produced evidence that, on September 21, 1934, the day before the transfers took place as per the contract of August 28, 1934, between the bank and the Associated's subsidiaries, the Chase purchased for $45,-000, or a little over 11 cents on the dollar of the notes, over $400,000 of Municipal notes plus 19,554 shares of its stock; these securities were a portion of those transferred to Associated's subsidiaries the next day. On this basis, the value of all the Municipal notes and stock transferred by the bank to the company's subsidiaries would be about $430,000, or little more than half of the difference in market value between the other securities given by Chase and those received by it in exchange. The evidence further shows that Chase's offer of $45,000 for the $400,000 notes was the best offer made in the two years during which the owner of those notes had attempted to sell them. Although the notes may be of substantially greater value to Associated's subsidiaries than they are to the Chase Bank, since the former have properties contiguous to those of the Municipal, it seems improbable that this difference in position accounts for such a difference in price.

Petitioners' affidavits are not very strong as to Associated's motive in giving the Chase excessive consideration for its securities, if such excessive consideration was in fact given. Mr. Love's affidavit indicates that the opposition of the bank to the plan was limited to a refusal to deposit its debentures and to letters, written in answer to specific requests for advice, indicating the bank's position in this regard and the reasons therefor. Exhibits attached to this affidavit show that the viewpoint of the bank, as expressed in letters written after the agreement with Associated's subsidiaries, remained one of opposition to the plan. Yet here, again, conflict between Love's and Burroughs' affidavits creates an element of considerable doubt. Burroughs makes the positive statement that "this transaction was carried through for the purpose of acquiring control of said Municipal Service Company and its subsidiaries and not because of any opposition to the Plan of Rearrangement of Debt Capitalization of Associated Gas & Electric Company." Love, however, states that the negotiations with the company were commenced at the instance of the Chase Bank in order to sell the notes. The suggestion that the purchase of the notes should also include the purchase of the company's debentures held by the Chase Bank came from of-

time, or indeed at any time, for the specific purpose of determining whether or not the quoted statements in petitioner's brief were false, and that for this reason he relied upon his attorney's statement to him as to the record.

ficials of the company sometime after the institution of these negotiations. It is apparent from this that the company, in concluding the transaction, was not motivated, as Burroughs intimates, solely by the thought of acquiring control of the Municipal Service Company, but that it had some other, equally strong, incentive. In my judgment, there is enough of a suspicious character surrounding the deal to justify petitioners' fear that their position as creditors may be endangered if such practices are allowed to continue without the supervision of the court.

The exchange of Associated's bonds "stamped for deposit under the plan" for preferred stock of General Gas & Electric Corporation, on the basis of $90 debentures for each $100 principal amount of preferred stock, is also attacked. The affidavits on each side are unsatisfactory on this issue. Petitioners' assertion that the exchanges were made to gain ostensible adherents to the Recap plan is refuted by Burroughs' statement that the policy of acquiring preferred stock of General Gas & Electric Corporation, through exchanges, for securities of the debtor had been continued for more than two years before the announcement of the plan and that a large majority of such stock had been acquired during those years. On the other hand, petitioners' affiant, Jonick, asserts that: "The General Gas & Electric Corporation on December 31, 1933, shows assets of $84,698,410.86. The investments of $83,231,190.33 included in such assets had an actual book value of only $30,310,207.61 as shown on page 6 of that Company's annual report." He further states that its bonds are in default, and that, on December 31, 1933, it had current assets, consisting of cash, amounting to only $2,688.74 against current liabilities of $1,383,447.82. None of these assertions are contradicted, except by the unsupported statement of Burroughs that "there is no truth in the statement that General Gas & Electric Corporation is insolvent. Its assets very largely exceed in value the amount of its outstanding indebtedness." Yet Associated's Annual Report for 1933 indicates that principal was past due on $133,000 principal amount of General Gas & Electric Cor-

poration bonds held by the public and interest was past due on $970,000 principal amount of the bonds, including the $133,000 so held. Despite petitioners' inadequate presentation of this aspect of their case, it seems clear that the preferred stock of the General Gas & Electric Corporation is not of any substantial value, and Associated's bonds given in exchange therefor were transferred without adequate consideration. Even if, as Associated alleges, the purpose of the exchanges was to acquire the publicly held stock of this subsidiary in order to simplify the corporate structure of the system and not to further the Recap plan, there would be no justification for the exchanges on inadequate consideration. This transaction is another which, in my judgment, justifies petitioners' belief that there may be a dissipation of assets if no injunction be issued.

The Dedham and Hyde Park deal upon which petitioners originally relied to show maladministration of Associated's assets has apparently been abandoned. Consequently it needs no discussion; petitioners have failed to prove that the contracts involved were detrimental to Associated or its creditors.

Little weight can be attributed to Associated's contention that, even if a danger of dissipation of assets is found, an injunction must be denied because the hardship to the company far outweighs the advantages to its creditors. As heretofore stated, petitioners at this time seek to enjoin the company only from taking any action out of the regular course of business unless and until notice and an opportunity to be heard thereon shall first be given. That such a limited order will not be unduly burdensome to Associated is evidenced by the fact that, although a stipulation to like effect has been in force for some time, no notice has been given of any contemplated transfer out of the regular course of business; furthermore, no showing has been made that the stipulation has adversely affected the interests of the company.

■ Subdivision (a) of section 77B (11 USCA § 207 (a), quoted in the margin,[12] is not controlling on the question of the

12 "Any corporation the majority of the capital stock of which having power to vote for the election of directors is owned, either directly or indirectly through an intervening medium, by any debtor, or substantially all of whose properties are operated by such debtor under lease or operating agreement, may file, with the

power of the court in this proceeding over Associated's subsidiaries; the only negative implication to be drawn from it is that the court has no power to reorganize or liquidate a subsidiary of a debtor corporation in the principal proceeding unless a petition therefor be filed by the subsidiary. It does not follow, however, that the court has no jurisdiction to restrain subsidiaries over whose action the debtor company has control, from so dealing with their assets as to dilute the equity of the debtor company and thus to endanger the interests of creditors on whose behalf the jurisdiction of the court was invoked. Petitioners do not seek to have this court administer the assets of the subsidiaries as property within the custody of the court; they aim only to prevent Associated from dissipating its assets under the guise of independent action on the part of its subsidiaries. For this reason, there is no analogy, such as Associated asserts, to bankruptcy cases denying applications for the extension of a receivership to the assets of the bankrupt's subsidiaries or for the turnover of the subsidiaries' assets. Moreover, such cases do not militate against the issuance of the injunction here sought. The decisive test in those cases is whether the subsidiary is dominated and controlled by the debtor corporation or is a completely independent entity. See, e. g., In re Indiana Flooring Co., 62 F.(2d) 763 (C. C. A. 2d, 1933). The record in this case is replete with instances evidencing the control by Associated over its subsidiaries. An earlier stipulation in this proceeding is perhaps the most striking example; the company thereby undertook, inter alia, to see that its subsidiaries, with the possible exception of a few minor ones, would not file a voluntary petition under section 77B in any other District or appear in any involuntary proceeding instituted in any other District. Certainly such an undertaking is an express recognition of Associated's control over its subsidiaries. Typical of other instances illustrative of

such control is the statement of Burroughs, vice president of the company, that he personally conducted the negotiations with the Chase Bank, although the contracts arising from those negotiations were made between the bank and two of the company's subsidiaries. To hold that the court has no jurisdiction to enjoin the subsidiaries as well as the debtor in the situation disclosed by the record now before me would be to deprive the court of any effective injunctive power whatsoever; neither reason nor authority compels that conclusion.

The motion for an injunction, in so far as it relates to the giving of notice of contemplated transfers out of the regular course of business, is granted on petitioners' filing bond in the sum of $5,000. Petitioners' further prayer that Associated be ordered to include in any such notice the reasons for the contemplated transfer and the proposed application of the proceeds to arise therefrom is, however, denied at this time, but without prejudice. The injury which might be occasioned to Associated by the grant of the broader injunction may well outweigh the advantage to petitioners. The requirement of timely notice, giving petitioners ample opportunity to secure injunctive relief, seems to be sufficient to protect the estate against any threatened dissipation of assets; to grant the broader relief requested might force the revelation of confidential matters, injurious both to Associated and, derivatively, to petitioners. Associated may, however, in any notice deem it best to disclose the reasons for the transfer and/or the intended application of proceeds in order that petitioners, if fully advised thereof, might find it unnecessary to apply for a specific injunction against the threatened transaction.

The question of how many days' notice shall be required is reserved until the settlement of the order to be entered pursuant hereto.

---

court in which such debtor had filed its petition or answer, and in the same proceeding, a petition stating that it is insolvent or unable to meet its debts as they mature and that it desires to effect a plan of reorganization in connection with, or as a part of, the plan of reorganization of such other debtor; and thereupon such court, if it approves such petition, shall have the same jurisdiction with respect to such corporation, its property, and its creditors and stockholders as the court has with respect to such other debtor."