**In re ASSOCIATED GAS & ELECTRIC CO.**

**In re ASSOCIATED GAS & ELECTRIC CORPORATION.**

Nos. 203, 204.

Circuit Court of Appeals, Second Circuit.

March 27, 1945.

Scribner & Miller, of New York City (Roscoe Pound, Charles E. Scribner, and Frank R. Bruce, all of New York City, of counsel), for appellants John P. Campbell and O. Clement Swenson, Committee for the Agecorp 73s.

Glass & Lynch, of New York City (Joseph Glass and Leslie Kirsch, both of New York City, of counsel), for appellant Empire Trust Co., Indenture Trustee for the Agecorp 73s.

Ralph Montgomery Arkush, of New York City, for appellant Agecorp 1978 Debentureholders Committee.

Cullen & Dykman, of Brooklyn, N. Y., for appellant Brooklyn Trust Co., Successor Indenture Trustees for Agecorp 1978 Debentures.

MacNeil Mitchell, of New York City, for appellant Walter Scott Foundation for the Aid of Crippled Children, Inc.

Ralph Montgomery Arkush, of New York City, Ralph W. Crolly, of Brooklyn, N. Y., and Matthew B. Price and M. Noel Renz, both of New York City, of counsel), for appellants Agecorp 1978 Debentureholders Committee and others.

Abraham Mitnovetz, of New York City, for appellants Irving Elias, Max Menachen, and Michael Moise, constituting the Protective Committee for the Holders of Convertible Obligations, Due 2002, All Series.

Boehm & Fischman, of New York City (Louis Boehm and Bernard D. Fischman, both of New York City, of counsel), for appellants Thatcher C. Jones et al.

Harry E. Karr, of Baltimore, Md. (Slade & Slade, of New York City, of counsel), for appellant Sparta Fritz, Jr.

Lewis M. Dabney, Jr., of New York City, special counsel for appellee Stanley Clarke, Trustee of Associated Gas & Electric Company, debtor.

Allen E. Throop, of New York City (O. John Rogge, William W. Golub, and Carlos L. Israels, all of New York City, of counsel), for appellees Denis J. Driscoll and Willard L. Thorp, Trustees of Associated Gas & Electric Corporation, debtor.

William Roberts, of New York City, for appellee Equitable Life Assur. Soc. of United States.

Jack Lewis Kraus, II, of New York City, for appellee Protective Committee.

Breed, Abbott & Morgan, of New York City (Jack Lewis Kraus, II, Lloyd V. Almirall, and Harry B. Kurzrok, all of New York City, of counsel), for appellee Underwriters Trust Co., Successor Indenture Trustee for Five Issues of Fixed Interest Debentures of Associated Gas and Electric Co.

Kelsey, Waldrop & Spalding, of New York City (H. Boardman Spalding, of New York City, of counsel), for appellee Colonial Trust Co., as Successor Indenture Trustee for the SFIDS of 1983 and 1986.

Hays, Wolf, Schwabacher, Sklar & Epstein, of New York City, for appellees George R. Walker et al., as Protective Committee for the Agecorp 8s of '40.

Rathbone, Perry, Kelley & Drye, of New York City (Hersey Egginton and F. W. Doolittle, Jr., both of New York City, of counsel), for appellee Central Hanover Bank & Trust Co., as Indenture Trustee for the Agecorp 8s of '40.

Davies, Auerbach, Cornell & Hardy, of New York City (H. C. McCollom, of New York City, and Quentin O. Young, of Brooklyn, N. Y., of counsel), for appellee Jacobs Committee for Holders of Conver-

tible Debenture Certificates (and Convertible Debenture Obligations) of Associated Gas & Electric Co.

Leo B. Mittelman and Joseph Nemerov, both of New York City, for appellees Benjamin Baker et al., as a committee for holders of Associated Gas & Electric Co. convertible obligations.

Nathan D. Shapiro, of Brooklyn, N. Y. (Leo B. Mittelman, of New York City, of counsel), for appellees Moses Spatt et al., as a committee for holders of Associated Gas & Electric Co. preference and preferred stock.

Roger S. Foster, Sol., Morton E. Yohalem, Robert M. Blair-Smith, and Leonard Helfenstein, Attys., all of Philadelphia, Pa., for appellee Securities and Exchange Commission.

Before SWAN, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

## AUGUSTUS N. HAND, Circuit Judge.

We have before us appeals from two orders, the first an order approving a plan of reorganization to which the Securities and Exchange Commission has given its approval; the second, an order approving a compromise of controversies existing between the estates of the respective debtors and among various classes of their security holders and creditors. We shall hereafter speak of the debtor Associated Gas and Electric Company as Ageco, and the debtor Associated Gas and Electric Corporation as Agecorp. Ageco is a top holding company, the assets of which consisted of stocks, bonds and other obligations of its subsidiary companies. Ageco and Agecorp are both public utility holding companies, and the reorganization proceedings of both were instituted by separate petitions filed January 10, 1940 under Chapter X of the Bankruptcy Act, 11 U.S.C.A. § 501 et seq.

The assets of Agecorp are valued at from $90,000,000 to $115,000,000. The liabilities of Agecorp on unsecured bonds and debentures in the hands of the public are $189,421,095, made up as follows:

| | |
|---|---|
| 8% Bonds due 1940 (8s of 40) | $ 7,438,510 |
| Convertible Fixed Interest Debentures due 1973 (73s) | 24,221,465 [1] |
| Income Debentures due 1978 (78s) | 133,539,655 |

Ageco has no assets except its interest in Agecorp, consisting of common stock and notes subordinated to all other indebtedness of Agecorp. Under the existing capitalization, neither Ageco nor any of its creditors would be entitled to share in the Agecorp assets, but by the compromise of claims in litigation against the Agecorp estate, which has been approved by the District Court, the 73s and the 78s would participate on a parity with certain creditors of Ageco in the plan of reorganization of the two companies after provision for the 8s of '40 to which the 73s and 78s are subordinate. The compromise (known as the Recap compromise) relates to two litigations, one pending in the Agecorp proceedings (called the Recap Litigation) and one in the Ageco proceedings (known as the CDC Litigation).

The Recap Litigation was a lawsuit instituted in the Agecorp proceeding by the petition of the Ageco trustee seeking adjudication of the following matters, among others: (a) The right, title, lien and interest of the Ageco trustee in and to the assets held by the Agecorp trustees. (b) The right of some or all of the unsubordinated security holders and other creditors of Ageco to share in the Agecorp assets on a parity, or better, with some or all of the Agecorp security holders and other creditors. The granting of any of this relief was opposed by the Agecorp trustees, and by the protective committees and indenture trustees for the 73s, the 78s and the 8s of 40.

A number of proofs of claim were filed in the Ageco proceeding by, or on behalf of, among others, holders of Convertible Debenture Certificates (hereafter referred to as CDCs); holders of Convertible Obligations Due 2002, who originally obtained their securities in exchange for CDCs, or the personal representatives, legatees, distributees or statutory successors of such original holders (collectively referred to as Original COs); holders, other than original holders, of Convertible Obligations Due 2002 (hereafter referred to as Non-original COs); holders of Convertible Certificates without fixed maturities; holders of Convertible Obligations with fixed maturities; holders of Interest Bearing Scrip, and holders of Non-Interest Bearing Scrip. These proofs of claim sought adjudications that the respective claimants were unsubor-

---

[1] The 73s are convertible into twice their principal amount of 78s, deposited by Agecorp estate for twice the principal amount above stated, or $48,442,930.

dinated creditors of Ageco and, as such, were entitled to share in the Ageco assets with other unsubordinated security holders and creditors. This was the CDC Litigation.

On November 9, 1942, the Ageco trustee and Agecorp trustees proposed a plan for the compromise of the Recap Litigation and related issues. The proposed compromise encompasses all the controversies involved in the Recap Litigation and the issues in the CDC Litigation relating to CDCs and Original COs, as well as other matters not relevant to the present appeals. The compromise plan would settle these issues by establishing a relative basis upon which the various security holders and creditors will share in the combined assets of Ageco and Agecorp. No provision is made for Scrip holders or for Non-original COs. The compromise received the approval of the District Court conditional upon its being embodied in a plan of reorganization accepted by creditors and confirmed by the court. The plan of reorganization, also approved, gives effect to the compromise.

The parties-appellant representing the interests of the 73s and 78s object to the approval of the compromise. They argue that, while the approval of a compromise concededly is within the sound discretion of the District Court, the soundness of the exercise of such discretion necessarily depends upon the claims to be compromised having sufficient merit to render the outcome of the litigation substantially uncertain, and that the claims advanced by the Ageco trustee in the Recap Litigation were not of sufficient merit. It would then follow that it was improper for the District Court to approve the compromise.

The dominant personality who seems to have controlled both Ageco and Agecorp was one Howard C. Hopson.

The Honorable Frederick E. Crane, Special Master, made findings which were approved by the District Court, of which the following are a part:

"16. Since prior to 1922, Ageco has been a public utility holding company, owning directly or through intermediate holding companies, voting stocks and other securities of electric, gas, water, ice, and transportation companies. * * *

"17. Between March 14, 1922 and April, 1923, Howard C. Hopson and John I. Mange acquired all the outstanding shares of the only class of Ageco stock having voting rights at all times up to January 10, 1940. Although other classes of Ageco stock obtained voting rights at various times during this period, Hopson and Mange held and exercised voting control of Ageco continuously from March, 1922 until January 10, 1940.

"18. From 1922 until January 10, 1940, Hopson controlled the financial and accounting policies of the Associated System.

"19. From 1922 until January 10, 1940, most of the officers of Ageco and Agecorp received no salary from Ageco or Agecorp directly, but were paid by companies owned by Hopson and his family * * * which furnished auditing, corporate, security, transfer, tax consultant, and other services to Ageco and its subsidiaries.

"20. Minute books of Ageco, Agecorp, Associated Properties, Inc., Associated General Electric Corporation, and Associated Utilities Investing Corporation, were kept by employees of the Hopson service companies, and resolutions appearing in the minute books were prepared almost entirely by such employees.

"21. The charges made by the Hopson service companies for services rendered to companies in the Associated System, enabled Hopson to derive profits, from 1922 through 1938, in excess of $6,500,000.

"22. At all times between January 1, 1929 and December 31, 1933, many of the directors of Ageco and its subsidiaries, and a majority of the boards of directors of Agecorp, Associated Properties, Inc., and Associated General Electric Corporation, were employees of the Hopson service companies. Some individuals, not so employed, acted as directors of Ageco at various times during this period.

"The financial, corporate, and all accounting policies of the Associated System were generally determined, in the first instance, by Hopson and employees of the Hopson service companies, and not by the boards of directors of the respective companies.

"23. Those employees of Hopson service companies who were directors of Ageco and its subsidiaries, executed undated resignations at the time of their election to office. * * *

"24. On December 31, 1921, prior to the acquisition of control by Hopson and Mange, the consolidated assets of Ageco and

its subsidiaries had a book value of $6,942,-570. At December 31, 1929, the book value of the consolidated assets had increased to $900,491,542.90, largely as a result of the acquisition of voting stocks and other securities of other public utility holding company systems and of various operating utility companies.

"25. The expansion of the Associated System was financed in large part by funds realized from the issuance of Ageco securities, or by exchanges of Ageco securities for securities of other holding company systems and operating companies. Part of the increase in the consolidated assets of Ageco and its subsidiaries was financed through the issuance of securities by sub-holding and operating companies in the Associated System.

\* \* \* \* \* \*

"33.[2] At all times from 1922 on, Ageco's assets consisted principally of voting stocks, other securities, and accounts and notes receivable, of subsidiary and affiliated holding companies. When securities of other holding company systems or operating companies were purchased, the practice was generally followed of vesting ownership at the time of acquisition in AUICorp, Aprops, Associated General Electric Corporation, or some other subholding company. Transfers of securities of subsidiary companies were frequently made from Ageco to subholding companies and from one subholding company to another.

"The directors of the interested companies knew or had notice that the transactions described in this Finding of Fact had occurred, but the transactions were generally consummated without the adoption of resolutions by the board of directors.

\* \* \* \* \* \*

"37. The vesting of ownership of securities in subholding companies, including AUICorp, Aprops, and Associated General Electric Corporation, was reflected in the books of account of Ageco and its subsidiaries by the recordation of open account transactions between Ageco and these companies. Advances to Aprops were carried on the books of Ageco as an account receivable through February, 1927, and as subscriptions to common stock of Aprops from that date through November, 1930. Advances to AUICorp were carried on the books of Ageco as an account receivable

through January, 1928 and, from that date through November, 1930, as subscriptions to common stock of AUICorp. Advances to Associated General Electric Corporation were carried on the books of Ageco as an account receivable from February, 1929 through May, 1929, and from that date through November, 1930, as subscriptions to the common stock of Associated General Electric Corporation. None of these companies had sufficient authorized stock, during these periods, to fill these subscriptions. These subscription accounts were originally placed on the books of account pursuant to instructions from Hopson.

\* \* \* \* \* \*

"42. The books of account of Ageco and the books of account of its subholding companies were all kept by a group of individuals having their offices in the same place, and whose work was supervised by employees of Hopson service companies. The books of account of Ageco and other companies in the Associated System were irregularly maintained in that some entries were post-dated, pre-dated, or revised after the dates when the transactions they purported to report had occurred."

\* \* \* \* \* \*

"75. At all times from 1931 through 1933, all the directors of AUICorp (or Agecorp) were all directors of Ageco.

\* \* \* \* \* \*

"87. In a number of letters and other documents sent to all holders of Ageco Debentures from May 15, 1933 to April 7, 1936, holders of Ageco Debentures were urged to deposit their securities under the Recap Plan in order to reduce the interest charges of Ageco and to avoid the danger of default and receivership, with the losses attendant thereto. The communications stated that persons exchanging under Options 1 and 2 would obtain priority of access to the assets and earnings of the Associated System, and that persons retaining their Ageco Debentures would not be entitled to share in the assets of Agecorp, in the event of liquidation of both Ageco and Agecorp, until the 73s and 78s had received 100 cents on the dollar."

As of March 1931 AUICorp acquired all the assets of Associated General Electric Corporation. On February 25, 1932, AUICorp changed its name to Agecorp. Aprops was merged into Agecorp in March 1932.

---

[2] Associated Utilities Investing Corporation is sometimes referred to as AUICorp, and Associated Properties, Inc., is sometimes referred to as Aprops.

The assets of Ageco, in the form of stocks and obligations of subsidiary companies, were transferred to Agecorp or Agecorp's predecessor companies in a series of transactions occurring from December 31, 1929, to March 31, 1932. Ageco received obligations of Agecorp in payment. Irregularities in the books occurred in connection with these transactions.

Late in March, 1932, Agecorp offered the 8s of 40 to the public, and thereafter approximately $10,000,000 principal amount of these bonds were sold.

"78. On May.15, 1933, pursuant to resolutions of its board of directors, Ageco announced a plan for the rearrangement of its debt capitalization (hereinafter referred to as 'Recap Plan') in a letter which was sent to all the security holders of Ageco. Under the Recap Plan, the holders of Ageco Debentures, then aggregating approximately $265,000,000 in amount, were offered three optional exchanges for their holdings:

"(a) Under Option 1, Agecorp 73s could be obtained in half the principal amount, and bearing the same fixed interest rate, as the Ageco Debentures exchanged;

"(b) Under Option 2, Agecorp 78s could be obtained in the same principal amount as the Ageco Debentures exchanged, but bearing a lower interest rate (ranging from ½ to 1% per annum, payable only if earned) ; or

"(c) Under Option 3, Ageco SFIDSs due 1983 could be obtained in the same principal amount, and with the same interest rate, as the Ageco Debentures exchanged. * * *

" * * * Holders of 73s were given the right to convert their securities into twice their principal amount of 78s at any time between June 15, 1935 and June 15, 1945. * * *

"The 73s and 78s were expressly subordinated by their terms to the 8s of '40."

On March 31, 1932, the debts of Agecorp to Ageco consisted of notes payable in the amount of $665,250,000 and an open account payable in the amount of $9,684,-344.68. But on that date the books of Agecorp indicated that $300,000,000 of the above debt of $665,250,000 was changed into interest-bearing convertible obligations of Agecorp payable to Ageco and that the balance, that is to say, $374,934,344.68, was converted into full paid subscriptions for capital stock of Agecorp. Thereupon Agecorp reduced the par value of its capital stock from $100 to $1 per share and thus created a fictitious surplus out of which, in order to effectuate the Recap Plan, it declared a dividend payable to Ageco in '73 and '78 bonds that were not to exceed an aggregate par value of $300,000,000 and that were to equal the Ageco debentures (hereafter called FIDs) which might be turned in under the Recap Plan.

The court below found that the following issues of law involved in the Recap Litigation were reasonably disputable:

"(a) Whether the transactions through which Agecorp acquired the assets it held at March 31, 1932, constituted transfers of the assets of Ageco which are void, or voidable by the Ageco Trustee or creditors, either because they were not authorized or ratified by the board of directors of Ageco, or because they were transactions, which were unfair to Ageco, between companies having common boards of directors;

"(b) (1) Whether the issuance of the 8s of '40 or the issuance of the 73s and 78s, or both, and the transactions connected therewith, constituted a violation of either or both of the restrictive covenants contained in the FIDs; (2) Whether, if Agecorp be recognized as a separate corporate entity, it acquired its assets subject to the claims of Ageco's FID holders, and must be presumed to have assumed the payment of those obligations;

"(c) Whether the transaction by which Ageco's. investment in Agecorp was changed from unsubordinated indebtedness into subordinated indebtedness or from unsubordinated indebtedness into stock, and the transactions connected therewith, are void or now voidable by the Ageco Trustee, either because they were not authorized or ratified by the board of directors of Ageco, or because they constituted a fraudulent conveyance of the assets of Ageco, or because they were transactions, which were unfair to Ageco, between companies having a common board of directors;

"(d) Whether the Recap Plan was an ineffective attempt to give holders of 73s and 78s priority over the holders of FIDs and other unsubordinated creditors of Ageco, which Ageco could not have given without the use of its subsidiary Agecorp;

"(e) Whether the separate corporate entities of Ageco and Agecorp should be ig-

nored, and the two corporations treated as one;

"(f) Whether the Recap Plan, apart from its antecedents, is unfair to the holders of FIDs who did not exchange;

"(g) Whether Option 2 of the Recap Plan is still open or may be reopened, and holders of FIDs may exchange their securities thereunder for 78s;

"(h) Whether the Trustee of Ageco and some or all of its creditors are barred by acquiescence, estoppel, laches, or limitations from attacking the priority of holders of * * * 73s, and 78s;

"(i) Whether superior equities exist in favor of holders of the * * * 73s and 78s, * * * which would make it unjust to deny them priority over the Ageco creditors."

(a)

■ The district court and the master, while finding that the issues embodied in (a) supra were reasonably disputable, do not seem to have relied on them as a substantial factor in support of the compromise, nor do we. Indeed, it seems fairly clear that the transactions through which Agecorp acquired the assets of Ageco which it held at March 31, 1932, were exchanges for securities of Agecorp at a time when Agecorp had substantially no indebtedness. In these circumstances it could make no difference to Ageco whether it retained the stock transferred to Agecorp or was itself the sole stockholder of the transferee. It is true that Agecorp at about this time issued $10,000,000 of its 8s of '40, but Ageco suffered nothing from this transaction because the cash received from the sale of these bonds was made available to it. We do not believe that there has been any showing that the transactions were not authorized or ratified by the board of directors of Ageco, inasmuch as the directors had notice of them and acquiesced over a period of years.

(b)

■ The court and special master apparently relied on their conclusions as to (b) (1) and (2) to support the compromise. But these cannot be regarded as completely determinative, for, if those issues were resolved in favor of the plaintiff in the Recap Litigation, no recovery could be had except for the benefit of certain FIDs whose bonds contained the restrictive covenants and no one else could receive any

benefit from these covenants. Since, under the compromise, other creditors of Ageco are allowed to participate in the assets of the combined estates, it is necessary, in order to support the compromise, to find some reasonably disputable issue or issues in the Recap Litigation, which, if resolved in favor of the plaintiff, might give some recovery to all Ageco creditors participating.

■ Notwithstanding the above, if a violation of the restrictive covenants were established, it would undoubtedly strengthen the position of the FIDs. The negative pledge covenant provides that (with certain irrelevant exceptions) no mortgage or pledge of Ageco property shall be made without ratably securing the interest and principal of the bondholders. The second restrictive covenant provides, among other things, that no conveyance of substantially all the assets of Ageco as an entirety shall impair the rights of the holders of FIDs, and that the transferee corporation shall assume the payment of principal and interest. If the restrictive covenants be interpreted literally, it cannot be said that they were violated. If, on the other hand, they be broadly interpreted, we agree with the court below that a transfer by Ageco of its assets to Agecorp, followed by the issuance of the 73s and 78s, would have substantially the same effect on the FIDs as a pledge by Ageco or a transfer in toto of its assets and, therefore, might be regarded as a violation of either or both of the restrictive covenants. We cannot say that a court might not reasonably have so decided in the Recap Litigation. The decision of Justice Schmuck in Rabenold v. Associated Gas & Electric Co., 148 Misc. 507, 266 N.Y.S. 520, did not settle this question. It certainly was not res adjudicata, because it was only an interlocutory order rendered on a motion for a temporary injunction; nor can it be regarded as a binding interpretation of the law of New York since additional facts to those before Schmuck were found by the court below to have been presented in the case at bar.

Although the transfers in this case covered a period of several years, yet we agree with the master that they might be regarded as steps in a single transfer. He said: "What cannot be legally done in one act does not necessarily become legal when the act is split up into various steps." In other words, the step by step transfer of all Ageco's assets might, within the mean-

ing of this covenant, be considered as part of a single scheme. If so, the Recap Litigation might well have resulted in a decision in plaintiff's favor on this theory.

It is to be noted that the view that the plaintiff in the Recap Litigation might recover because of the violation of the second restrictive covenant is not only in accord with the opinions of the master and the district court, but also with the opinion of Judge Mack, who said in granting a preliminary injunction in the 77B proceeding involving Ageco: "there seems to be a serious question as to whether these transfers to the *corporation* were made in violation of a covenant * * * that no conveyance of 'substantially all the properties of the Company as an entirety' shall be effected unless the transferee thereof expressly assumes the obligation." In re Associated Gas & Electric Co., D.C., 11 F. Supp. 359, 370.

## (c), (d), and (e)

It is evident from the findings and an examination of the record that Hopson treated Agecorp and Ageco as his personal agencies, had their stocks registered in the name of Day & Co., a dummy partnership, himself paid the directors of Ageco and Agecorp, and so directed their activities that, as Judge Mack said when granting a preliminary injunction in the 77B proceeding: "There can be no doubt that the *corporation* is little more than a bookkeeping unit of the *company*. It has no real organization, its officers and directors are the officers and directors of the *company,* and its accounts are kept in the offices of the *company* in Ithaca." In re Associated Gas & Electric Co., D.C., 11 F.Supp. 359, 370.

When some of the FIDs were persuaded to exchange their securities for 73s and 78s, it was because of Hopson's desire to reduce the interest burden on Ageco's indebtedness, and his well-grounded fear that Ageco could not meet its obligations. The same motives induced his decision to transfer the assets of Ageco to Agecorp. If his plan had been completely successful, and all the FIDs had been exchanged, he would have defrauded Ageco's other security holders. As matters turned out he defrauded the non-exchanging FIDs as well.

It can make no difference whether relief be grounded upon a theory of avoiding fraudulent transfers or unfair transactions between companies having a common board of directors, or upon the attempt to give holders of 73s and 78s priority over the FIDs and other unsubordinated creditors of Ageco or upon the broad principle of equity stated by Mr. Justice Roberts: "that the doctrine of corporate entity, recognized generally and for most purposes, will not be regarded when so to do would work fraud or injustice." Taylor v. Standard Gas Co., 306 U.S. 307, 322, 59 S.Ct. 543, 550, 83 L.Ed. 669.

It may reasonably be contended that the transfers we have mentioned were made with complete disregard of the rights of any creditors of Ageco who did not make the exchange, and also that the corporations supposed to be engaged in the Recap Plan were no more than paper corporations employed to carry out the schemes of Hopson. As the Special Master said: "In reality, on the evidence in this case, it is very easy to determine that Agecorp and Ageco were one and the same, and that Agecorp had no separate identity. * * * However this may be, the corporate entity could not be used as a mere instrument for fraud * * *. A wholly-owned subsidiary whose directors and officers are the same, having no property except that transferred to it by its parent, cannot be used under the circumstances of this case for doing that which the parent could not do itself. This is the crux of the entire case."

In reality, but one issue is presented by (c), (d), and (e). The issue is whether a court of equity, presented with the details of Hopson's machinations and their results, would use its powers to give relief to the unsubordinated creditors of Ageco. Whether this relief should take the form of ignoring the corporate entities, in accordance with the principle enunciated by Mr. Justice Roberts, or whether it should take the form of setting aside transactions as fraudulent or inequitable is not a matter which we need discuss. In either event, the basic question, the answer to which will determine if any relief is to be granted, is whether such conditions of fraud or inequity were present as would move the court to grant some equitable remedy. We cannot say, in the light of the evidence, that this issue is not debatable.

While Sampsell v. Imperial Paper Corporation, 313 U.S. 215, 61 S.Ct. 904, 85 L.Ed. 1293, does not precisely govern this case, we think that Justice Douglas, in effect, laid down the rule that where there is

a fraudulent transfer to a subsidiary, or where the subsidiary corporation is the mere "corporate pocket" of the dominant stockholder, the creditors of the subsidiary are given no priority over the creditors of the dominant stockholder, but share on a parity with the latter's creditors in the assets transferred to the subsidiary, unless the creditors of the subsidiary can show by clear and convincing evidence that a denial of priority to them would work an injustice. The evidence in the case at bar would support an inference that the subsidiary Agecorp was merely the corporate pocket of Ageco, and also a finding that the step-by-step transformation of Ageco's investment in Agecorp from unsubordinated indebtedness into stock, together with the transactions connected therewith, constituted a fraudulent transfer of the assets of Ageco. Nor have the objecting creditors of Agecorp shown that a denial of priority to them would work injustice. In the case at bar, it is the granting of such a priority that would work the injustice. It is true that the holders of FIDs who made the exchange did so upon representations that they would thereby gain priority over the other creditors of Ageco. In making the exchange, they acquiesced in and took advantage of Hopson's unlawful attempt to subordinate the FIDs who did not choose to exchange, as well as other Ageco creditors. They gave nothing to Agecorp to obtain this advantage. Before their securities were exchanged, they would have shared in the assets of Ageco on a parity with the other unsubordinated creditors. Under the rule of the Sampsell case, a decision destroying the priority which the exchanging bondholders had no right to obtain, and restoring the parity which originally existed, might well follow. We certainly can not say that an argument for such a result would have no chance of success.

▮▮▮ We do not here distinguish between the 73s and 78s who obtained their securities by exchange, and those who bought in the open market. Market purchasers may have been ignorant of the antecedents of their bonds and of the dealings of Hopson with the two corporations, and may have paid a price for their securities based on the assumed priority. It may be that inequity will result unless such innocent bondholders are allowed such participation in the combined assets as will equal the price they paid for their securi-

ties. The burden, however, is on the bondholder to prove his right to such participation. " * * * the theme of the Bankruptcy Act is equality of distribution. * * * To bring himself outside of that rule an unsecured creditor carries a burden of showing by clear and convincing evidence that its application to his case so as to deny him priority would work an injustice." Sampsell v. Imperial Paper Corporation, supra, 313 U.S. at page 219, 61 S.Ct. at page 907, 85 L.Ed. 1293. Not only has no clear and convincing evidence been presented on behalf of the market purchasers of 73s and 78s, but the evidence before us tends to show that no premium price was paid for these bonds by reason of any supposed priority. The Ageco debentures sold substantially on a par with these Agecorp obligations over a period of several years prior to the reorganization and we agree with the conclusion of the SEC that this fact indicates that no part of the prices of the 73s and 78s was a reflection of any supposed priority enjoyed by these bonds.

We have not discussed the controversial issue as to whether Hopson's transactions were ratified by his dummy directors. Assuming they were not, the other grounds were a sufficient and more reasonable basis for a decision in favor of the Ageco parties in the Recap Litigation.

### (f) and (g)

It is unnecessary to discuss the particular issues involved in (f) and (g) for the reason that, if the questions were resolved in favor of the plaintiff in the Recap Litigation, no recovery could be had save for the benefit of the FIDs and, therefore, a decision that any or all of these questions are debatable would not be determinative of the validity of the compromise.

### (h)

▮▮▮ We cannot say that either the trustee of Ageco, representing its creditors, or the creditors themselves, are barred from attacking the priority of 73s and 78s by the abandonment of some seven creditors' suits, many of which had been provoked by these particular transactions. There is no proof that the 73s and 78s have been damaged by the abandonment of these litigations and consequently there is no estoppel. The ratification of manipulations of Hopson by his dummy directors, or by stockholders, could not cure the

fraud upon the creditors of Ageco, nor constitute an estoppel against them. United Hotels Company of America, Inc. v. Mealey, Trustee, 2 Cir., 147 F.2d 816.

 It is equally true that acquiescence and laches cannot be said to have clearly constituted a bar. The New York statute of limitations had not run. The rule is that laches will not be found by reason of a mere lapse of time that is less than the statutory period. We are not persuaded that any doctrine of laches had to be applied to shorten the period in the present case.

In Southern Pacific Co. v. Bogert, 250 U.S. 483, 39 S.Ct. 533, 63 L.Ed. 1099, there had been various prior suits, which had been discontinued. Even though twenty-two years had elapsed, due diligence was found to have existed and a finding of laches was denied where no prejudice to defendants had been shown. It similarly may reasonably be argued that there has been no showing in this case sufficient to enable the 73s and 78s to invoke the doctrine of laches.

### (i)

It is not necessary to discuss this issue separately, inasmuch as it is controlled by what we have already said under (c), (d) and (e).

### Interest Allowance to 73s

 The 73s, but not the 78s, object to the allowance made them in compensation for the interest lost by them as a result of their exchange of FIDs under the Recap Plan. They argue that if they are restored to the position of holders of FIDs, which they exchanged for their present securities, they should be allowed the full amount of the difference between the interest paid to FIDs, and that paid to 73s, during the years since the exchanges were made. The objection is not sound. In the first place, it is doubtful whether the 73s, if issued under a plan that was fraudulent as to FIDs not making the exchange, and as to other creditors of Ageco, would be entitled to any compensation for lost interest, as against such creditors. First Nat. Bank v. Flershem, 290 U.S. 504, 521, 54 S.Ct. 298, 78 L.Ed. 465, 90 A.L.R. 391. In the second place, even if they ought to be allowed interest, it would be reasonable to hold that the claim should not have been allowed on a priority basis, but only on the basis of a general claim for the difference

between the interest which they received from Agecorp and such interest as they would have received if they had not exchanged FIDs for 73s. If either of these doubtful matters were resolved against them they would receive much less than they have been allowed under the Plan.

### Advantages of Compromise to 73s and 78s

 The same line of reasoning answers the contention of the 73s and the 78s (who have been treated even more generously with regard to interest) that they are getting no more under the compromise than they would have received had they been defeated in the Recap Litigation. The contention is unsound for, if they had been defeated in that litigation, they might well have been allowed no interest beyond what their bonds called for, or might have been allowed no prior claim for such interest adjustment as might have been granted.

In addition to this, the 73s and 78s benefit, like all other creditors, from the reduction in the total of the claims of the 8s of 40, which might well have been allowed in full.

### Exclusion of Evidence

We have examined the objections by the 78s to the exclusion of certain items of evidence and find them to be without merit.

### COs and Scrip

The Non-original COs and the holders of Scrip object to the compromise and plan because they have been given no participation in the assets.

 The Non-original COs contend that the subordination clauses of their bonds are void and unenforcible, because obtained through fraud and misrepresentation, and because no consideration was given by Ageco for the agreement to subordinate. But that Non-original COs are subordinate was decided by this court in Elias v. Clarke, 2 Cir., 143 F.2d 640, 644, 647, in which the issue was squarely presented. The contention of the Non-original COs that the court exceeded its jurisdiction and passed on matters not before it we find to be without merit.

 Original holders of COs received their bonds in exchange for CDCs, and are granted participation in the assets on the theory that they may have a claim for rescission or damages based on fraud or mis-

representation in connection with the exchange. The statement in the case of Elias v. Clarke that under the New York law "a claim for fraud or misrepresentation in connection with an obligation evidencing a debt * * * does not pass merely with the transfer of the obligation itself, where there are lacking special words of assignment * * *", forecloses Non-original holders of COs, of whatever series, from asserting any such claim.

■ The Non-original COs and Scrip also contend that they are entitled to participate even if the express language of subordination clauses governs. By this language, COs and Scrip are made subordinate to all other obligations of Ageco except "obligations convertible into stock at the option of" Ageco. (Other exceptions are not here relevant.) Certain obligations of Ageco, convertible into stock at Ageco's option, are allowed to participate in the assets. These obligations are not, by their terms, subordinated. It is the contention of the Non-original COs and holders of Scrip that COs and Scrip are on a parity with these convertible obligations which have been allowed participation, since COs and Scrip are subordinate to all obligations of Ageco *except* convertible obligations. Therefore, they reason, it is improper to allow participation to these convertible obligations and deny participation to COs and Scrip, with which the participating obligations are on a parity.

This contention must also fail. COs and Scrip can be entitled to nothing whatsoever until all creditors to whom they are subordinated have been paid in full. The FIDs, to which the COs and Scrip are expressly subordinated, are not being paid in full. All that is received by the unsubordinated convertible obligations comes out of an estate to which COs and Scrip can have no claim, since creditors to which they are subordinated (FIDs, 73s, 78s and the 8s of 40) would exhaust the assets if paid in full. If the estate was valued at a sum in excess of the aggregated claims of creditors to which COs and Scrip are subordinate, the COs and Scrip might have a right to share in the assets of the estate in excess of the aggregate of the claims to which COs and Scrip are subordinated. That question we do not decide, for it is not before us. The assets of the estate do not exceed the aggregate of prior claims. The Non-original COs and Scrip have no right to participation, and what may have

been allowed to creditors holding convertible obligations of Ageco is no concern of theirs.

■ The Non-original COs and holders of Scrip maintain that the foregoing is not sufficient to deny them participation. They argue that exclusion is not compromise; that since they have been given nothing, their claims have not been compromised. They contend that the Recap Litigation, if pursued to judgment, might have resulted in the participation of subordinate creditors of Ageco and therefore, even if Non-original COs and Scrip are subordinate, they should be given something in recognition of their possible right to participate.

This contention cannot be sustained. Under no possible outcome of the Recap Litigation would subordinate creditors of Ageco be entitled to participate.

■ We have held that recovery in the Recap Litigation could not properly be based upon the theory that the transfers of assets to Agecorp prior to May 31, 1932, standing alone, were void or voidable. A recovery based upon a finding that Option 2 of the Recap Plan was still open, or that the Recap Plan was unfair to holders of FIDs who did not exchange, would benefit no one but the FIDs. A recovery based upon a finding that the restrictive covenants were violated would be for the sole benefit of those of the FIDs whose bonds contained the restrictive covenants. If the Recap Plan was an ineffective attempt to give 73s and 78s priority over holders of FIDS and other unsubordinated creditors of Ageco, that is no concern of the subordinated creditors. The claims of the 73s, 78s and FIDs are, in the aggregate, more than sufficient to exhaust the assets of the combined estates. Therefore, subordinate creditors are entitled to nothing if the corporate entities be ignored and Ageco and Agecorp be treated as one. If recovery in the Recap Litigation is based upon avoidance of the transaction by which Agecorp's investment in Agecorp was changed from unsubordinated indebtedness to subordinated indebtedness or stock, and the transactions connected therewith, the "transactions connected therewith" must include the exchange of FIDs for 73s and 78s. The 73s and 78s will in that event revert to their FID status. Upon any of these possible theories, the 73s, 78s and FIDs must be paid in full before Ageco's subordinate creditors may be paid at all,

and payment of 73s, 78s and FIDs will exhaust the assets.

██ The Scrip Holders Protective Committee contends that original holders of Scrip should be allowed to participate on the same basis as original holders of COs. We do not agree with this contention. As we have said, Original COs are allowed to participate not on the strength of their securities, but because they may have a right of action based upon fraud or misrepresentation. This right of action could not be based upon the possession of Original Scrip. Scrip was issued in payment of interest on COs. There was no fraud in the issuance of the Scrip, whatever fraud there may have been in issuing the COs themselves.

It is urged that a different result is required by the following language of the Elias case, 143 F.2d 640, at page 647:

" * * * It may be noted that the order below did not differentiate between original and transferee holders of the scrip; all are treated alike. This seems doubtful on the court's own theory. Since original holders of the converted bonds by assumed premise still retain whatever rights of action for misrepresentation they had, it would seem to follow that their rights of action also encompassed claims with reference to the scrip—a point of interest to those who still retained their bonds at least as to the amount of their claims, as well as to those who had parted with their bonds, but not their scrip, since presumably these latter are not barred from pressing their claims. It may be, however, that the proceedings below with reference to the compromise did take note of these distinctions. On the theory which we have followed, they become unimportant to the disposition of this appeal."

As was there pointed out, the matters discussed in the words quoted were not necessary to the disposition of the Elias case. The validity of the distinctions there suggested was not decided. The court was merely directing the attention of those framing the compromise to matters which they should consider before reaching a final conclusion. The court did not direct that any weight be given these distinctions. It is quite evident that the court itself came to no final conclusion as to their validity, and merely wished to have the question brought out more fully in later proceedings.

The District Court found that the proceedings below with reference to the compromise did take note of these distinctions, both before and after the Elias case. This would seem to be determinative of the matter.

### Fairness of the Plan

██ We have examined the various participations awarded to security holders by the Plan and find them based upon equitable principles and upon the strength of the litigating positions of the respective claimants. The 73s and 78s are the only participating creditors who complain of the percentages awarded them. For the reasons we have indicated in our discussion of the legality of the compromise we think the Plan fair and equitable as to them as well as to the other participants.

### Appeal of Sparta Fritz, Jr.

The appellant Fritz objects to the Plan upon three grounds: (1) That the value which the court placed upon the assets of Ageco and Agecorp is too low; (2) that under the Plan, the surviving company will have only a short term indebtedness, with the result that it will be required to pay more annually in federal taxes than it is required to pay today; (3) that certain bondholders, including the appellant, are given common stock instead of securities of indebtedness.

██ Testimony as to valuation was taken before the Securities and Exchange Commission and before the District Court. Fritz seems to object to the method of valuation employed—capitalization of earnings. But capitalization of earnings is a well-recognized method of valuation, and we cannot say that the use of this method was improper. We think it sufficiently appears that the valuation was based upon consideration of the facts relevant to future earning capacity, as required by the rule of Consolidated Rock Products Co. v. Dubois, 312 U.S. 510, 526, 61 S.Ct. 675, 85 L.Ed. 982. The valuation was based upon competent evidence which we hold sufficient to justify it.

██ The objection of Fritz to the capital structure proposed by the Plan must also be overruled. The alternative structure proposed by Fritz was attacked by other participants on the ground that it would prove disadvantageous to the operations of the surviving company, the market prices

of its securities, and tax-wise; the SEC found that his proposals were "fantastic". In the light of the evidence, we can not say that the District Court abused its discretion in rejecting Fritz's proposed structure.

■ There is no merit in the contention that bondholders are entitled to something more than common stock in the reorganized company. It is not inequitable to allow bondholders stock in the surviving company, rather than securities of indebtedness.

We have carefully considered the arguments brought forward in this most complicated and difficult case, which litigation might prolong for years. It has been dealt with by the Master, Judge Crane, and Judge Leibell in a most painstaking manner. We think that the compromise and plan which they have sanctioned, and the SEC has approved, are fair and equitable and are not disposed to revise their judgment in putting them into effect.

For the foregoing reasons the orders are affirmed.