**DABNEY v. CHASE NAT. BANK OF
CITY OF NEW YORK.**

No. 115, Docket 22129.

United States Court of Appeals
Second Circuit.

Submitted May 29, 1952.

Decided Jan. 8, 1953.

636

John A. Anderson, New York City, of counsel, for appellant.

Lewis M. Dabney, Jr., pro se.

A. Donald MacKinnon, New York City, Milbank, Tweed, Hope & Hadley, New York City (Rebecca M. Cutler and William E. Jackson, New York City, of counsel), for Chase National Bank of the City of New York, defendant-appellee.

Before SWAN, Chief Judge, and L. HAND and CLARK, Circuit Judges.

L. HAND, Circuit Judge.

When this case was before us after trial —196 F.2d 668—we held that there were two questions on which we wished the parties to present arguments, because they had not been discussed. First: for what part of the payment of $4,000,000, collected in the spring of 1932, must the bank account? Second (really one aspect of the first): who of the bondholders were entitled to share in the payment? When the case had been before us on the first appeal,[1] we had held that the second and fourth counts of the complaint stated valid claims;

1. Clarke v. Chase National Bank, 2 Cir., 137 F.2d 797.

and on the second appeal we held that, although the plaintiff had not proved the case stated in the fourth count, he had proved that stated in the second. The court was divided on both points: Judge CLARK and I concurring as to the second count; and Judge SWAN and I as to the fourth. Regarding the second count we had said on the first appeal, 137 F.2d at page 801: "Even though the absence of a res may make the word 'trustee' inapposite, Chase was at least an agent equally obligated to refrain from competing with its principals, the debenture-holders. There was certainly a fiduciary relation to which the obligation generally applicable to trustees would apply." Judge Conger had held that "Ageco" was insolvent in 1932, when the loan was paid, but that the bank did not have such notice as was required to make the payment a voidable preference in bankruptcy; but there remained the question whether, notwithstanding the absence of such notice, the bank's collection of the loan was a breach of its fiduciary duty; and we held (1.) that, it was, provided the bank had notice in 1932 that there was a serious likelihood that "Ageco" would not be able to pay the bonds at their maturity; and (2.) that it did have such notice. We then held that it was not necessary to decide whether the payment of $4,000,000 in 1932 had resulted in lessening the dividend in reorganization of the bondholders in 1940, because if it had, their loss would be the same as the bank's gain, and the bank, like any other fiduciary, was accountable for any gain that came to it as a result of its breach of duty.[2]

That duty was not to increase the risk that the bonds might not be paid at maturity by collecting the loan at a time when "Ageco" was in danger of insolvency, although the bank would have been free to force a payment of the loan at any time when it did not know "Ageco's" solvency to be doubtful. The indenture had given it the right to lend to "Ageco," and that implied the right to collect; but it was not free to exercise that right if in doing so it brought itself into competition with its beneficiaries. On the other hand, since the right to collect was tolled only when its exercise did compete with the bondholders we might perhaps have held that the bank's liability for collecting in 1932 would have ended, if at any time between then and 1940 there had been a period during which the risk ceased, even though it later reappeared. Since the bank did not show that there had been any such period, we need not decide that question; and we shall therefore dispose of the appeal on the assumption that it was under a continuous duty to the bondholders until 1940, when "Ageco's" assets were distributed. The parties differ as to the proper computation of the gain that the bank derived from this default: i. e. whether it should be the whole difference between the sum collected —$4,000,000—and the bank's dividend in reorganization; or only that fraction of this difference that the bonds, outstanding in 1940, bore to all "Ageco's" indebtedness at that time (including not only the bonds but the loan). The plaintiff's position may be most forcefully stated as follows. Since it was impossible in 1932 to know by how much the sum withdrawn would lessen the bondholders' dividend, it was not lawful for the bank to collect any part of the loan, and the gain from this breach of duty was the whole difference between $4,000,000 and the bank's dividend.

 This misconceives the nature of the remedy, when the beneficiary seeks to recover the fiduciary's gain. It is granted on the theory that the beneficiary may adopt the fiduciary's transaction as though it had been made on his behalf. In the case at bar the sum collected upon its receipt by the bank in 1932 became subject in its hands to a constructive trust; but it was a trust in which the bondholders had no immediate, but only a future and contingent, interest: i. e. that it should be available in the event of "Ageco's" insolvency to bring the bondholders' dividend up to the amount it would have been, had the bank not collected the loan. Whatever part of the payment that addition turned out to be was all that the bank would be

2. Restatement of Trusts, § 205(c), § 206 Comments i & l.

638

obliged to repay, for it was as free to keep the remainder in 1940 as it had been free to collect it in 1932. The fact that it had all along been impossible to forecast how great this addition would be, did not enlarge the bondholders' interest in the payment, or give them the power to adopt as their own the collection of any part of it that could never be theirs. It is another matter whether the interest, contingent as it was, would be enough to allow the bondholders to "avoid" the whole payment (of which more in a moment). The plaintiff answers that this conclusion runs counter to Mc-Candless v. Furlaud, 296 U.S. 140, 56 S.Ct. 41, 80 L.Ed. 121, but he mistakes the scope of that decision. It was no more than a holding that the consent of all the shareholders of a corporation to a series of steps in a fraudulent flotation of its securities, was no defence to an action by its receiver against the promoters of the scheme. No one questioned that the flotation had been a fraud on those to whom the securities were issued; but the defendants' argument was that the receiver had no standing to recover on behalf of the victims, because he could speak only in the name of the corporation, and the corporation by its shareholders had consented to the transactions at their inception. In the case at bar the only persons against whom any wrong was committed were the bondholders, and we are holding that the reorganization trustee may enforce all remedies to which they would be entitled in any action or proceeding. For the foregoing reasons we hold that, unless there be something in the Bankruptcy Act to the contrary, the measure of the bank's gain is the fraction we have described of the difference between $4,000,000 and the bank's dividend in reorganization.

■ There remains the plaintiff's other argument that, as the claim arises in bankruptcy Moore v. Bay, 284 U.S. 4, 52 S.Ct. 3, 76 L.Ed. 133, controls, the effect of which was that § 70(e) of the Bankruptcy Act made the "transfer" in 1932—i. e., "Ageco's" payment of the loan,—"voida-

ble" in toto, because it was "voidable" by the bondholders. In Moore v. Bay the bankrupt, a corporation, had executed a chattel mortgage in California where the statute required it to be filed within seven days. The mortgagee had delayed filing it for some time beyond the limit, so that the mortgage was confessedly invalid as to those creditors whose claims had arisen before the filing date; but the mortgagee insisted that it was good against those whose debts had arisen later. The Court of Appeals, 9 Cir., 45 F.2d 449, so decided; but the Supreme Court held that § 70(e) [3] made the mortgage invalid as to all the creditors, if it was invalid as to any one of them. The section has been amended since then, but its substance is still the same, and it now declares that a "transfer made * * * by * * * a bankrupt * * * which, under any Federal or State law * * * is fraudulent as against or voidable for any other reason by any creditor * * * shall be null and void as against the trustee"; and that every "such transfer * * * shall be avoided by the trustee for the benefit of the estate." There are two answers to the argument that this interpretation of the section governs the case at bar. First, even verbally, the facts do not fit the text; and second, the purpose of the section does not extend to "transfers," to "avoid" which a creditor must resort to a right, acquired by virtue of a transaction between himself and the transferee, and not between himself and the bankrupt.

■ In the case at bar no creditor except the bondholders could have challenged the payment, and the answer to the first question depends upon whether they could have "avoided" it "under any Federal or State law." We think that they could not have done so. As we have said, the bank was always entitled to the immediate payment of that part on the sum collected that would not be distributed to the bondholders in insolvency; and incidentally that was certain to be very substantial. On the other hand it is quite true that this part of the payment was not only indeterminate in

3. § 110(e), Title 11, U.S.C.A.

1932, but was certain to remain so until either the bonds were paid in full, or "Ageco" became insolvent. Moreover, it is of course a well recognized doctrine, especially in equity, that a court will ordinarily throw upon one who has committed a wrong, the burden of answering any doubts as to the measure of restitution.[4] Thus, at first blush it might appear that the bondholders could have successfully invoked this principle, and thus have "avoided" the whole payment at any time after 1932. On the other hand, like any other equitable remedy, "avoidance" of the "transfer": *i. e.*, rescission, is a remedy dependent upon balancing the relative interests involved, and in a case where the injured party has another and a complete remedy and where rescission will deprive the wrongdoer of rights which are his in spite of his wrong, a court of equity will not grant rescission.[5] Nor does it matter that in the case at bar the claim, being upon a "trust," would before the Rules have rested, not upon the "auxiliary," but upon the "original," jurisdiction of equity; for equity, which could pass a decree for the payment of money,[6] has always adapted its relief to the needs of the occasion. Therefore, rescission would have exposed the bank's loan to the continued risk of "Ageco's" insolvency until the bonds were paid; and, although that would indeed have been right and necessary, so far as concerned that part of the payment that would in the end go to the bondholders, to expose the remainder to the same risk would have denied the bank its right to the immediate and unconditional payment of that much. If therefore there would have been available a remedy other than rescission that would at once have protected the contingent interest of the bondholders and have preserved the bank's right, the bondholders would not have been entitled to rescind. There was such a remedy. Since the bondholders were entitled to no present payment in 1932 or until 1940, all that they needed until then was assurance that in case of "Ageco's" insolvency their position could be the same as though the bank had not collected the loan. In short, all they needed in the interim was security. Considering how small, compared with the bank's resources, any recovery could be, it is conceivable that a declaratory judgment might have been the only relief granted; but in any event the remedy would have gone no further than to require the bank to give security for any eventual payment that might be required of it. To grant a rescission would have enforced the unnecessary surrender of rights that it had not forfeited.

So much for the literal meaning of § 70 (e). We think that its purpose also precludes its application to the facts at bar. The bondholders' claim arises because the bank's collection of the loan was a violation of a fiduciary relation that they derived, not from "Ageco," but from the bank. They not only had no right in 1932 to "avoid" the payment merely as creditors of "Ageco"; but they had no such right by virtue of any interest that "Ageco" had given them as security for their rights as creditors; they remained simple creditors. Their right to treat the payment as a constructive trust had as little to do with any right derived from "Ageco," as though the bank had made an outside agreement with them that it would not collect its debt until the bonds were paid. It seems likely that the proper interpretation of the section is that it applies only to occasions where the "Federal or State law" "under" which the "transfer" is "avoided" directly nullifies it *ex proprio vigore,* and not indirectly by creating rights (*e. g.* a lien) out of some transaction between one creditor and the bankrupt which the "transfer" would defeat, if it were valid; in short that the

---

4. Story Parchment Co. v. Paterson Parchment Co., 282 U.S. 555, 563, 565, 51 S. Ct. 248, 75 L.Ed. 544; President and Directors of Manhattan Co. v. Kelby, 2 Cir., 147 F.2d 465, 476.

5. Phoenix Mut. Life Insurance Company v. Bailey, 13 Wall. 616, 20 L.Ed. 501; American Mills Co. v. American Surety Co., 260 U.S. 360, 363, 43 S.Ct. 149, 67 L.Ed. 306; Atlas Life Ins. Co. v. W. I. Southern Inc., 306 U.S. 563, 571, 59 S. Ct. 657, 83 L.Ed. 987.

6. Moore v. United States, 5 Cir., 182 F. 2d 332, 334, 335.

"creditor's" right must be conferred upon him simply because he is a creditor. One can see how the Bankruptcy Act might wish to provide that the benefit of such a "law" should redound to the benefit of all creditors; but to go further seems to us to impute to Congress a most improbable intent. Suppose, for example, that the bankrupt borrows money from A upon an agreement that A shall have as security a one half interest in the bankrupt's stock in trade, or the whole interest in a specified part of that stock; and that the bankrupt then "transfers" the stock to B, who takes with notice of the agreement. A can "avoid" the "transfer" as to his interest in the stock; but may the bankrupt's trustee reclaim as part of the estate, not only that half, but the half which A was free to "transfer" and B to receive? If so, B has lost what he was confessedly free to acquire as a penalty for taking from A what he was not free to acquire. However, the question is not before us, because, as we have said, the bondholders may not invoke any "law" that created rights arising out of a transaction between them and the bankrupt. To make the section apply we must say that all creditors of a bankrupt share in property that the transferee ought not to have accepted because of an agreement between him and one creditor, but that the bankrupt was free to convey so far as concerned any right that that creditor had against him. We cannot agree that anything in Moore v. Bay, supra, 284 U.S. 4, 52 S.Ct. 3, 76 L. Ed. 133, justified such a conclusion.

■ Having so disposed of the first question on which we asked briefs, we come to the second: *i. e.* whether all bondholders whose bonds were outstanding in 1940 are entitled to share in the recovery, or whether only those are so entitled who held their bonds in 1932 and continued to hold them until 1940: in short, whether the right against the bank passed with the bond, or remained in the transferrer. This question came before us several times while it was still the law of New York—now changed by statute—that the claims of "series" bondholders against a trustee do not pass to the transferee of the bond, in all situations when they arise out of a breach of the

trustee's duty. We need refer only to Elkind v. Chase National Bank, 259 App.Div. 661, 20 N.Y.S.2d 213, affirmed without opinion, 284 N.Y. 726, 31 N.E.2d 198, and Smith v. Continental Bank & Trust Co., 292 N.Y. 275, 54 N.E.2d 823. After a detailed analysis of the first of these decisions in Manufacturers Trust Co. v. Kelby, 2 Cir., 125 F.2d 650, we concluded that in New York if the claim was for restitution for a surrender of the *res,* it accompanied the transfer of the bond, being the equivalent of the original security itself. And we held that the contrary doctrine was limited to occasions where the trustee had defaulted in some duty of care or management in his administration that did not amount to a surrender. This interpretation we have reaffirmed in Brooklyn Trust Company v. Kelby, 2 Cir., 134 F.2d 105, 111, and President & Directors of the Manhattan Co. v. Kelby, 2 Cir., 147 F.2d 465, 476, 478, and we are not disposed to reconsider it. Therefore, the only question here is whether the plaintiff's claim is for restitution of a security which the trustee surrendered or appropriated; or whether it is only for failing properly to administer the trust. As we noticed at the outset of this opinion, Clarke v. Chase Nat. Bank., supra, 137 F. 2d 797, declared that there was no *"res"* in the case at bar, and that was true, not only when the indenture was executed, but it remained true until 1932, when the bank collected the loan. Strictly, it remained true even thereafter: that is, if one confines the meaning to an express trust; but it is not true, if one includes a constructive trust. As has already appeared, we hold that when the bank received the payment there attached to it a trust to preserve it as security for the contingent benefit of the bondholders; but whether that constructive trust required the bank to keep the sum intact, we need not decide. If it did, the bondholders' claim was literally for the restitution of a security held for the beneficiary and appropriated by the trustee. If on the other hand, in view of the bank's individual interest in the payment, the constructive trust did not require it to keep the payment intact, its appropriation by the bank was certainly conditional upon its as-

suming an obligation to make restitution if restitution ever became necessary. It would be altogether gratuitous to import a distinction between the transfer of such an obligation to the transferee of a bond, and the transfer of the obligation to make restitution for an unauthorized appropriation of the *res*. All the considerations which determine the second apply equally to the first. For these reasons we hold that all bondholders who held unpaid bonds in 1940 were entitled to share in the prescribed fraction of the difference between $4,000,-000 and the bank's dividend in reorganization.

 It remains to consider the position of those bonds that were "deposited" upon any of the three options open under the "Recap" plan. It is the law in New York as elsewhere [7] that the release of a principal releases the surety, and we will assume that the cancellation of any of the bonds here in suit would *pro tanto* have released the bank because its liability, as we have seen, was a partial security for the payment of the bonds. Therefore, we must decide whether the deposit of a bond under the "Plan" cancelled it, or was only a transfer, like any other transfer. The "Escrow Agreement" under which the bonds were "deposited," provided that, until the "retirement" of all the debentures that were to be issued pursuant to the plan, the "escrow agents" were "to collect the interest on the deposited debentures to the extent, but only to the extent that there shall be consolidated net income," of "Agcco" and "Agecorp"; and they were to apply it to prescribed purposes not relevant to this issue. Then followed a provision authorizing them to collect the principal of "any deposited debentures," and finally a provision that in case of the non-payment of the principal on any of the "deposited debentures," or of any other default, the "agents" were to have discretion to "take any action with respect to such default and the enforcement of the principal of such debentures as any other holder of debentures of such issue might be entitled to take." Thus it appears that the "deposited debentures"

were not cancelled, but were transferred to the "agents," to whom passed the rights of the holders against the bank, exactly as they would have passed upon any other transfer. We are not here concerned with the proper disposition of any recovery by the "escrow agents" upon "deposited debentures" held by them; it is enough that they stood upon the same footing as any other bonds. Nor do we see any reason why the reorganization trustee may not represent them as well as the others. We therefore hold that any bonds deposited under the "Recap Plan" are to be included with the rest.

 A final question is as to interest. Since the bondholders were entitled to no payment until 1940, whether their recovery be regarded as damages or trustee's gains no interest ran before petition filed, and, of course, none ran thereafter.

 In view of the partial success of the appeal, the plaintiff should recover his costs and disbursements.

The judgment will be reversed and the cause remitted for proceedings in accordance with the two foregoing opinions upon this appeal.

CLARK, Circuit Judge (dissenting).

I do not see why the principle of Moore v. Bay, 284 U.S. 4, 52 S.Ct. 3, 76 L.Ed. 133, 76 A.L.R. 1198, applying Bankruptcy Act § 70e, 11 U.S.C. § 110(e), is not directly in point and controlling. Of course we must apply bankruptcy law if there is any. Prudence Realization Corp. v. Geist, 316 U. S. 89, 62 S.Ct. 978, 86 L.Ed. 1293. The statutory provision appears to me to cover the matter in express terms; objections to its application here are along lines—"windfall," unjust enrichment of certain creditors—similar to those overruled in the Moore case and following precedents; and the objective of equality of distribution without attempting fine differentiations of supposed equities among kinds and classes of creditors is equally strong. Hence I would apply the rule to require refund of the payment made in breach of fiduciary obligation, together with interest during the

---

7. Kirby v. Taylor, 6 Johns.Ch.N.Y., 242; Restatement of Security, § 122.

period it has been held. At the same time I think defendant should be restored to its position of creditor and receive its dividend in reorganization with other creditors.[1]

I am not sure that I understand all the objections to the application of Moore v. Bay relied on in the opinion. I take it, however, that they are three: (1) that the purpose of § 70e does not extend to transfers to avoid which a creditor must resort to a right acquired by virtue of a transaction between himself and the transferee, and not between himself and the bankrupt; (2) that the bondholders could not have avoided the payment when made in 1932 or at any time before the reorganization in 1940; and (3) that the trustee owed a duty only to the bondholders, not to the estate at large, and only for the proportion that they have supposedly lost.

For an understanding of the first two points in particular, we must note the terms of the Act which, as amended in 1938, are somewhat more inclusive than the portions quoted in the opinion. Sub. (1) of 11 U.S.C. § 110(e) is as follows: "A transfer made or suffered or obligation incurred by a debtor adjudged a bankrupt under this title which, under any Federal or State law applicable thereto, is fraudulent as against or voidable for any other reason by any creditor of the debtor, having a claim provable under this title, shall be null and void as against the trustee of such debtor." Sub. (2) goes on to state: "All property of the debtor affected by any such transfer shall be and remain a part of his assets and estate, discharged and released from such transfer and shall pass to, and every such transfer or obligation shall be avoided by, the trustee for the benefit of the estate."

A use of the debtor's property such as we find here, if it is to have any validity as against the debtor, must have been made in the exercise of some power which stems in the last analysis from the debtor. Here this is all the more apparent, for the debtor made the payments, however unwillingly, in part even before the loan from Chase was due. 196 F.2d at page 672. So there was at least an "obligation incurred by a debtor" in the words of the statute. And in view of the manifest objective of the legislation I can see no basis for reading in or adding to the statute such a restriction as is attempted in Point 1.

So as to Point 2, to say that the bondholders could not have avoided the payment from 1932 to 1940, but could have asked only for security, seems to me fanciful. No authority is given; the precedents cited indeed look the other way. The view presented is contrary to first principles of trust law. Moreover, it conflicts with the salutary holding in our first decision herein. Either the payment was a violation of fiduciary obligations or it was not. If it was the former, as we have held, I know no basis upon which its avoidance could be denied or the beneficiaries barred from remedies for the restoration of the trust. If later the threatened insolvency passes, that may lessen the impulse for remedial action, or possibly cut down the extent of the recovery; but it hardly changes the fact of the breach. Even when the lesser and partial remedy of security is conceded, a breach of duty and hence a case under the statute are admitted in effect. I therefore believe the statute to be fully applicable in letter and intent.

Point 3 seems to me so much the usual objection of transferees and obligees to

---

1. Though the argument based upon Moore v. Bay receives only secondary discussion in the opinion, it was actually the trustee's primary contention. For the sake of brevity and because I think this so controlling, I do not discuss alternative contentions. But since I reject the scaling down of the fiduciary's obligation by the amount of the debtor's indebtedness, I would reach the same result whether under the rule of equity receiverships, of state law, or of indenture trustee's accountability under § 212, 11 U.S.C. § 612. McCandless v. Furlaud, 296 U.S. 140, 56 S.Ct. 41, 80 L.Ed. 121; Corbin, The Subsequent Bondholder and His Trustee, 51 Col.L.Rev. 813; In re Solar Mfg. Corp., 3 Cir., 200 F.2d 327. Under any theory of recovery, its amount should be measured by the same standard, namely, the extent of the fiduciary's delinquency.

the Moore v. Bay principle—and so regularly overruled, as the cases collected in 4 Collier on Bankruptcy 1526–1537, 14th Ed. 1942, show—that I think I can properly term it the anti-windfall argument. I do not see that our case differs substantially in favor of the transferee from that, say, of a conditional vendor or chattel mortgagee who has not properly recorded his conditional sale or chattel mortgage and finds he has lost the goods for the benefit of all creditors, including those who were in no wise affected by the sale. Nor does it differ from one who has received a preference and must return it in full, no matter what the status or equities of the creditors. For it was to avoid that morass of attempted unscramblement that the statute was designed. It hardly lies in the mouth of the transferee to raise the objection; indeed, those bondholders who may be deprived of a greater dividend or even payment in full might better be heard in complaint of a rule which would so cut down their recovery. But a reorganization court has obviously greater powers to adjust equities between security holders than obtained in straight bankruptcy proceedings; and if this well worn argument against Moore v. Bay is perchance still thought to have some force in the latter, it should have much less here. In fact, when this case was first before us, we thought that recovery would be for the indenture bondholders under the priority given them as such, and so stated, Clarke v. Chase Nat. Bank of City of New York, 2 Cir., 137 F.2d 797, 801. Nor do I understand that the provision quoted above for recovery by the trustee "for the benefit of the estate" is so ironclad as to exclude from a plan of reorganization such priorities as would be natural to safeguard indenture bondholders. The fact is that of course distribution of the fund is not before us. In any event, how the distribution would be fitted into a plan of reorganization, or perhaps adjusted to the plan already approved, In re Associated Gas & Elec. Co.,

D.C.S.D.N.Y., 61 F.Supp. 11, affirmed 2 Cir., 149 F.2d 996, certiorari denied Elias v. Clarke, 326 U.S. 736, 66 S.Ct. 45, 90 L. Ed. 439, seems to me not a matter for the delinquent fiduciary to decide. So I submit with deference that this contention is not entitled to the substantial weight it appears to have been given in the opinion.

My belief that Moore v. Bay controls is ventured with greater assurance in view of the curious, not to say bizarre, effects of the rule actually adopted, viz., to estimate recovery by the amount of debenture bonds outstanding in relation to the amount of total outstanding indebtedness of the debtor. (Applying that ratio here, the parties compute the recovery as cut by three-fourths.) Why 1940, the date of reorganization, is made crucial, rather than some other date, such as 1932, the time of the transfer, is not at all clear to me. But passing that, it is surely an anomaly to have the amount of a fiduciary's refund *decreased* by an *increase* in the debtor's obligation. For obviously increasing the divisor is going to decrease the quotient. Had Chase had both sufficient prescience and bold spirit of piracy, it might well have felt impelled to take all the steps it could after the 1932 transaction to aid and abet Hopson in his wild financial transactions; for the more he piled up obligations on the debtor, the less would be the refund ultimately due from Chase.

The original decision herein finding liability, Dabney v. Chase Nat. Bank of City of New York, 2 Cir., 196 F.2d 668, represented in my view a healthy development, applying the normal public interpretation of "trustee" to the hitherto anomalous bond indenture trustee; it seemed a sound recognition of what the investing public was entitled to expect. The present decision, whittling down recovery to a fraction on principles far from clear cut and on ratios variable from case to case—*inversely* to the size of the financial failure—does much to falsify that original holding.